Angela M. Machala (SBN: 224496)
AMachala@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Fl.
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile:   (213) 615-1750

Abbe David Lowell (*admitted pro hac vice*)
AbbeLowellPublicOutreach@winston.com
Christopher D. Man
CMan@winston.com
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
Telephone:   (202) 282-5000
Facsimile:   (202) 282-5100

Attorneys for Robert Hunter Biden

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ROBERT HUNTER BIDEN,<br><br>                    Defendant. | **Case No. 2:23-cr-00599-MCS-1**<br><br>*Hon. Mark C. Scarsi*<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT BASED ON IMMUNITY CONFERRED BY HIS DIVERSION AGREEMENT**<br><br>Hearing Date:  March 27, 2024<br>Time:               1:00 PM<br>Place:              Courtroom 7C |

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

TO: SPECIAL COUNSEL DAVID WEISS, PRINCIPAL SENIOR ASSISTANT SPECIAL COUNSEL LEO J. WISE, SENIOR ASSISTANT SPECIAL COUNSEL DEREK E. HINES

PLEASE TAKE NOTICE that on March 27, 2024, at 1:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of Honorable Mark C. Scarsi, Defendant Robert Hunter Biden, by and through his attorneys of record, will, and hereby does, respectfully move this Court for an order dismissing the Indictment because it violates a Diversion Agreement that is in effect between Mr. Biden and the prosecution. The Diversion Agreement is unambiguous, binding, and enforceable and Paragraph 15 of the Diversion Agreement provides Mr. Biden with "broad immunity."

Mr. Biden's motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the pleadings, papers, and documents on file with the Court, the oral arguments of counsel, and such other matters as the Court may deem proper to consider.

Date: February 20, 2024

Respectfully submitted,

WINSTON & STRAWN LLP

By: _/s/ Angela M. Machala_
Angela M. Machala
Abbe David Lowell
Christopher D. Man

_Attorneys for Robert Hunter Biden_

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND.................................................................................1

    I.    The Diversion Agreement ................................................................2

    II.    The Execution Of The Diversion Agreement Concerning The Gun Charge Did Not Depend On The Plea Agreement Being Accepted By The Court On The Misdemeanor Tax Charges.......................................4

ARGUMENT............................................................................................................7

    I.    THE DIVERSION AGREEMENT REMAINS IN FORCE .....................7

        A.    The Diversion Agreement Is An Unambiguous, Binding, And Enforceable Contract.................................................................7

        B.    To The Extent There Is Any Ambiguity In The Diversion Agreement, It Must Be Construed In Mr. Biden's Favor ................9

        C.    The Prosecution's New Claim That The Diversion Agreement Is Not In Effect Conflicts With Its Prior Statements.....................11

        D.    It Makes No Difference That Probation Did Not Sign The Diversion Agreement ...............................................................13

            1.    Probation was Not A Party To The Agreement ..................14

            2.    Probation, In Fact, Approved The Diversion Agreement ......16

        E.    Judicial Estoppel Precludes The Prosecution From Denying The Validity Of The Diversion Agreement Or Probation's Approval ....18

    II.    THE DIVERSION AGREEMENT'S IMMUNITY PROVISION REQUIRES DISMISSAL OF THE INDICTMENT ...............................19

CONCLUSION......................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ................................................................. 8, 19

*Carroll v. Peake*,
    26 U.S. 18 (1828) ...................................................................... 17

*CKSJB Holdings LLC v. EPAM Sys., Inc.*,
    837 F. App'x 901 (3d Cir. 2020) ................................................. 9

*Gen. Refractories Co. v. First State Ins. Co.*,
    500 F.3d 306 (3d Cir. 2007) ....................................................... 11

*Harrison v. Dixon*,
    2013 WL 4759681 (Del. Ch. Sept. 5, 2013) .............................. 17

*LPPR, Inc. v. Keller Crescent Corp.*,
    532 F. App'x 268 (3d Cir. 2013) ................................................. 9

*MBIA Ins. Corp. v. Royal Indem. Co.*,
    426 F.3d 204 (3d Cir. 2005) (Alito, J.) ....................................... 8

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ................................................................... 18

*Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*,
    258 F.3d 645 (7th Cir. 2001) ...................................................... 17

*Prime Victor Int'l Ltd. v. Simulacra Corp.*,
    2023 WL 4546333 (D. Del. July 14, 2023) ................................. 9

*Roadway Express, Inc. v. Gen. Teamsters, Chauffeurs, and Helpers Union*,
    330 F.2d 859 (3d Cir. 1964) ....................................................... 17

*Santobello v. New York*,
    404 U.S. 257 (1971) ......................................................... 1, 8, 19

*United Rentals, Inc. v. RAM Holdings, Inc.*,
    937 A.2d 810 (Del. Ch. Dec. 21, 2007) ...................................... 9

*United States v. Biden*,
    No. 1:23-cr-00061-MN (D. Del.)......................................................1

*United States v. Biden*,
    No. 1:23-mj-00274-MN (D. Del. 2023).........................................1

*United States v. De La Fuente*,
    8 F.3d 1333 (9th Cir. 1993) ......................................................10

*United States v. Fabian-Baltazar*,
    827 F. App'x 774 (9th Cir. 2020) ................................................5

*United States v. Franco-Lopez*,
    312 F.3d 984 (9th Cir. 2002)................................................5, 10

*United States v. Garcia*,
    519 F.2d 1343 (9th Cir. 1975) .....................................................8

*United States v. Gotti*,
    457 F. Supp. 2d 411 (S.D.N.Y. 2006) .........................................9

*United States v. Jackson*,
    21 F.4th 1205 (9th Cir. 2022).....................................................10

*United States v. Lamanna*,
    2016 WL 616580 (W.D. Pa. Feb. 16, 2016) ...............................19

*United States v. Molina*,
    2023 WL 8188598 (S.D.N.Y. Nov. 27, 2023) ..............................8

*United States v. Plascencia-Orozco*,
    852 F.3d 910 (9th Cir. 2017)..................................................8, 19

*United States v. Purcell Envelope Co.*,
    249 U.S. 313 (1919) ..................................................................17

*United States v. Spear*,
    753 F.3d 964 (9th Cir. 2014)......................................................10

*United States v. Wells*,
    124 F. App'x 735 (3d Cir. 2005) (Becker, J.) ..............................8

*United States v. Wingfield*,
    401 F. App'x 235 (9th Cir. 2010) ..............................................10

*In re Wash. Mut., Inc.*,
  421 B.R. 143 (Bankr. D. Del. 2009).............................................................. 17

*Whittington v. Dragon Group LLC*,
  2013 WL 1821615 (Del. Ch. May 1, 2013)............................................... 17

**Statutes**

18 U.S.C. § 922(g)(3)...................................................................................... 1

26 U.S.C. § 7203 ............................................................................................. 1

**Other Authorities**

U.S. Const., amend. II.....................................................................................4

U.S. Const., amend. V ..................................................................................... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION[1]

The Indictment against Mr. Biden must be dismissed because it violates a Diversion Agreement that is in effect between Mr. Biden and the prosecution. In exchange for Mr. Biden giving up various rights—including his Fifth Amendment right to remain silent by agreeing to the Statement of Facts drafted by the prosecution and numerous restrictions on his liberty—the prosecution agreed to provided him sweeping immunity. The prosecution agreed with the Delaware court that "the agreement not to prosecute . . . includes the time period from 2014 to 2019, it only includes tax charges in that time period." (Ex. 1 at 58 (Mr. Wise).) Nevertheless, the prosecution brought this nine-count felony indictment concerning tax years 2016 through 2019 anyway. *See also* Diversion Agreement at II(15) (Ex. 2) (providing immunity for the statement of facts in the Plea Agreement); Memorandum of Plea Agreement at 7, No. 1:23-mj-00274-MN (D. Del. 2023), DE 28 (Ex. 3) (statement of facts addressing tax issues arising in 2016 through the filing of 2019 taxes in 2020). Because Mr. Biden gave up valuable rights as part of this contract, in exchange for the prosecution's promise not to prosecute him, "such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971).

### FACTUAL BACKGROUND

The prosecution filed two separate Informations against Mr. Biden on June 20, 2023. One Information charged Mr. Biden with a single count of felony unlawful possession of a firearm as a user of a controlled substance under 18 U.S.C. § 922(g)(3). The other Information charged Mr. Biden with two misdemeanor tax offenses: (1) failure to timely pay taxes due April 17, 2018 under 26 U.S.C. § 7203, and (2) failure to timely pay taxes due April 15, 2019 under 26 U.S.C. § 7203.

---

[1] This motion was raised and is fully briefed in the gun-related felony prosecution the Special Counsel filed in Delaware. *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del.) All docket entry (DE) citations in this motion refer to that matter, unless stated otherwise.

Mr. Biden and the prosecution resolved the Information with a gun charge on July 26, 2023 through a Diversion Agreement, although the prosecution is trying to renege on that Agreement by indicting Mr. Biden on September 14, 2023 on three felony gun charges related to the purchase of the same firearm that is addressed in the Diversion Agreement. The Delaware court granted the prosecution's motion to dismiss the gun charge Information on October 11, 2023, due to a subsequent Delaware felony gun Indictment. Mr. Biden's filings in response to the prosecution's motion to dismiss, as well as his Pretrial Service Report, make clear he has followed the terms of the in-force agreement.

The misdemeanor tax charges in Delaware preexisted the Diversion Agreement and could have been prosecuted there under the Plea Agreement, but the prosecution motion to dismiss the tax Information was granted on August 17, 2023. Months later, on December 7, 2023, the prosecution filed this nine-count felony tax Indictment in California, which is precluded by the Diversion Agreement. Mr. Biden now seeks to dismiss the Indictment based on his Diversion Agreement with the prosecution.

## I.   The Diversion Agreement

Mr. Biden resolved the Information on the gun charge by entering into a Diversion Agreement with the prosecution on July 26, 2023. The only parties to the Diversion Agreement are Mr. Biden and the prosecution. (Ex. 2 at I; Ex. 1 at 83 ("Roman numeral one, the parties to the Diversion Agreement are the United States of America by and through the United States Attorney's Office for the District of Delaware and Robert Hunter Biden.") (Mr. Wise).) Every party to that Agreement signed it on or before July 26, 2023, and the court's approval was not needed for it to become effective.[2]

---

[2] Negotiating this resolution with the prosecution was made difficult because the prosecution could not make up its mind about what it wanted and repeatedly moved the goal posts whenever a resolution was in reach. Christopher Clark, Mr. Biden's primary lawyer who negotiated the agreement, describes those negotiations at length in his declaration. (Ex. 4 [hereinafter "Clark Declaration"].) Initially, the prosecution required only that the resolution (1) be public and (2) involve an agreed upon statement of facts, and the parties were close to reaching some form of a non-charge, non-prosecution agreement. (Ex. 4 ¶¶6, 12.) Throughout all negotiations, Mr. Biden's counsel *always* made clear than any resolution reached must bring about the finality of the prosecution's investigations of Mr. Biden. (*Id.* ¶¶6, 11, 27–28.) After the prosecution informed defense counsel that was acceptable, and Mr. Biden agreed in principle, the prosecution

With the parties' approval of the Diversion Agreement on July 26, 2023, a twenty-four-month diversion period began.  (Ex. 2 at II(1).)  If Mr. Biden complied with his obligations under the Diversion Agreement, the prosecution would not bring new charges against Mr. Biden for his past conduct and proceedings on the Information would not be pursued.  Within thirty days of the expiration of the diversion period, the prosecution would dismiss the Information if Mr. Biden had satisfied his obligations under the Diversion Agreement. (*Id.* at II(4) & (15).) The prosecution contends the diversion period did not start until the Probation Office signed the agreement.  As will be explained in this motion, the Probation Office signature was not required, but it approved the agreement[3] nevertheless.  Moreover, the two parties had a binding agreement between themselves, regardless of whether Probation chose to sign or approve the Agreement.

Ever since Mr. Biden entered into the Diversion Agreement more than six months ago, he has complied with his obligations under that Agreement.  Mr. Biden also agreed

then explained that U.S. Attorney David Weiss had changed his mind.  (*Id.* ¶10.)  He then wanted a deferred prosecution agreement (DPA) on the gun charge.  Later, the prosecution suggested a diversion agreement in place of the DPA. (*Id.* ¶12.)  Charges would be filed on the gun charge and two misdemeanor tax charges, but no plea by Mr. Biden would be required.  After that agreement in principle was reached, Mr. Weiss changed his mind yet again and insisted upon a guilty plea on two misdemeanor tax charges along with the Diversion Agreement for the firearm offense. (*Id.* ¶15.)  Defense counsel continued to insist that any resolution resolve "any and all" investigations of Mr. Biden completely, and the prosecution made clear that would be accomplished by providing immunity for conduct described in broadly worded statements of fact. (*Id.* ¶¶11, 21.)  Ultimately, the prosecution drafted the Diversion Agreement conferring such immunity that was signed by all parties, which would not require judicial approval, and a separate Plea Agreement with respect to the misdemeanor tax charges, which would require the Court's approval. As explained below, the Court can and should resolve this motion based on the face of the Diversion Agreement itself.  All parties agree that consideration of parol evidence is inappropriate in construing the terms of the agreement.

[3] Margaret Bray, Chief U.S. Probation Officer, sent a copy of Mr. Biden's Pretrial Diversion Report to Mr. Biden's counsel on July 19, 2023. (Ex. 5.)  The Report conveys the following Recommendation: "The United States Probation Office recommends the defendant as a candidate for a 24-month term of Pretrial Diversion." (*Id.* ¶37.)  The Report attaches the then-proposed Diversion Agreement, and notes that Mr. Biden agreed with the factual statement. (*Id.* ¶35.)  On July 20, 2023, the prosecution emailed the Court, copying Ms. Bray and defense counsel, to report that "[t]he parties *and Probation have agreed* to revisions to the diversion agreement to more closely match the conditions of pretrial release that Probation recommended in the pretrial services report issued yesterday." (7/20/23 Email from B. Wallace to M. Buckson (Ex. 4 at 160 (Clark Decl., Ex. T) (emphasis added).)  The parties then signed the Diversion Agreement on July 26, 2023.  Critically, this email makes clear that they are the Parties to the Agreement, and then separately there is Probation, who is not a party.

not to exercise his Second Amendment right to possess a firearm during the diversion period (which he could otherwise do because he has not used illicit substances in more than four years).  (Ex. 2 at II(9).)  Mr. Biden is subject to a host of other conditions, including agreeing to supervision by Probation and drug testing and treatment as directed by Probation.  (*Id.* at II(10).)

In return, as the prosecutor told the Delaware court on July 26, 2023, Mr. Biden is entitled to immunity for any conduct described in the Statement of Facts in the Diversion Agreement and the Statement of Facts in the Plea Agreement, discussed in more detail below.  (*Id.* at II(15).)  Among other things, the prosecutor was explicit that "based on the terms of the [Diversion] agreement, we cannot bring tax evasion charges for the years described in the factual statement to the Plea Agreement." (Ex. 1 at 54–55 (Mr. Wise).) Similarly, Mr. Biden's counsel told the court, without objection, that the parties agree this provision "broadly relate[s] to gun possession, *tax issues*, and drug use." (*Id.* at 57 (Mr. Clark) (emphasis added).)

## II.   The Execution Of The Diversion Agreement Concerning The Gun Charge Did Not Depend On The Plea Agreement Being Accepted By The Court On The Misdemeanor Tax Charges

On July 26, 2023, the same day the parties signed the Diversion Agreement, Mr. Biden also entered into a Plea Agreement with the prosecution to resolve the Information with the misdemeanor tax charges.  Unlike the Diversion Agreement, the Plea Agreement required the judicial approval to become effective, and it did not become effective because the Delaware court did not accept the Plea Agreement.[4]

---

[4] The Delaware court deferred its ruling on whether to accept the plea agreement, without deciding whether the Plea Agreement was appropriate.  (Ex. 1 at 95 (Court stating, "I'm not saying that it's not [valid]"); 109 (Court clarifying it is not deciding whether or not to accept the Plea Agreement).)  The court questioned how the immunity provision of the Diversion Agreement would work in the hypothetical situation where the prosecution alleged a breach of the agreement, acknowledging that may never occur.  (Ex. 1 at 95 (Court saying, "I'm not saying you are going to breach.").)  The court's concern was that the prosecution would need the court to decide there was a breach before bringing any new charges, when the court is not a party to the Diversion Agreement.  Following the hearing, the prosecution withdrew its plea offer, so the issue of the validity of the Plea Agreement was not briefed further.  Had it been briefed, the court's concern easily could

It is important to recognize that, by its terms and both parties in-court statements, the Diversion Agreement and the Plea Agreement are separate, independent agreements. By its own terms, the Diversion Agreement made clear that "[i]t constitutes the complete and final agreement between the United States and Biden on this matter. There are no other agreements, written or otherwise, modifying the terms, conditions, or obligations of this Agreement." (Ex. 2 at II(19).) The validity of the Diversion Agreement did not depend on the Delaware court's acceptance of the Plea Agreement in any respect. (*See* Ex. 3 ¶38.)

With no hesitation or qualification, the prosecution agreed with the Delaware court that the Agreements are "completely separate," and added that "the plea agreement stands on its own." (Ex. 1 at 42 (Mr. Wise); *see also id.* at 52 (explaining the Plea Agreement does not incorporate the Diversion Agreement).) Similarly, Mr. Biden's counsel explained: "The parties have taken the position that the Diversion Agreement is a separate agreement from the Plea Agreement. The Diversion Agreement is a bilateral contract between the parties." (*Id.* at 57 (Mr. Clark).) The validity of the Diversion Agreement was not an issue before the Delaware court on July 26. (Ex. 1 at 50 (Court explaining "you are not asking me to sign off on" the Diversion Agreement), 92 (Court explaining the Diversion Agreement is "a separate agreement, there's no place for me to sign off on

---

have been addressed. First, the court's concern was entirely hypothetical as Mr. Biden had no intention of breaching the agreement and, even if it were breached, he and the prosecution could very well resolve any issue without turning to the court. Other remedies are available under the Agreement. (Ex. 2 at II(14)(a).) Thus, no actual issue was likely to arise. Second, the provision merely reflects that the Diversion Agreement is a contract entered into in Delaware, and any party alleging a breach of the contract could seek to enforce the contract in that court, like any other contract. Third, even if that provision of the Diversion Agreement could not be enforced, it would be severable and not render the Agreement void. Mr. Biden sacrificed numerous rights by entering into the contract and was abiding by its terms, so he would be entitled to the benefit of his bargain, including a judicial determination of whether there had been a breach before he could be stripped of the Agreement's protections. *See United States v. Fabian-Baltazar*, 827 F. App'x 774, 775 (9th Cir. 2020) ("Our firm precedent holds that where the validity of a plea agreement is in question, 'we favor a construction under which the agreement is legally valid over an interpretation that would require voiding the agreement.'") (quoting *United States v. Franco-Lopez*, 312 F.3d 984, 991 (9th Cir. 2002)).

it"); *see also id.* at 51 ("[W]e are not asking the Court to rule in any way on the Diversion Agreement.") (Mr. Wise).)

Even before the hearing, the prosecution expressed its agreement that the Diversion Agreement resolved the charge in the firearm Information in emails with defense counsel regarding a draft press statement by Mr. Biden's counsel. (*See* Ex. 4 ¶¶35–36.) The prosecution agreed that Mr. Biden's counsel could say "the firearm charge [is] subject to a diversion agreement and will not be subject to the plea agreement." (Email from C. Clark to S. Hanson (Ex. 4 at 143 (Clark Decl., Ex. P).) Moreover, Mr. Biden's counsel had proposed saying that this "concluded" the prosecution's investigation (into whatever the Agreement covered), but the prosecution preferred the word "resolved," so the draft was changed to "it is my understanding that the five-year investigation into Hunter is resolved." (*Id.*) Those words are synonymous and reflect that the investigation is now over. *Compare concluded*, Merriam-Webster Dictionary (2023), https://www.merriam-webster.com/dictionary/concluded (defining "concluded" as "to bring to an end"), *with resolved*, *id.*, https://www.merriam-webster.com/dictionary/resolved (defining "resolved" as "to deal with successfully" or "to find an answer to" or "to reach a firm decision about"). Plainly, with the prosecution telling Mr. Biden's counsel that at least the tax issues (through a misdemeanor plea) and firearm charges (to be diverted) have been "resolved" by the Diversion Agreement, neither Mr. Biden nor his counsel would have thought otherwise.[5]

Again at the July 26, 2023 hearing, all sides recognized that the Diversion Agreement remains in effect. Using the present tense, the prosecution told the court: "Your Honor, the Diversion Agreement is a contract between the parties so it's in effect until it's either breached or a determination [of breach has been made], period." (Ex. 1 at 91 (Mr. Wise).) Similarly, Mr. Biden's counsel told the Court: "I want to be clear that it

---

[5] This understanding is further supported by the clear fact that when Mr. Biden's counsel asked AUSA Shannon Hanson directly, on July 19, 2023, "whether there was any other open or pending investigation of Mr. Biden overseen by the Delaware U.S. Attorney's Office . . . she responded there was not[.]" (Ex. 4 ¶36.)

is the parties' position that there is a Diversion Agreement between the parties which is binding." (*Id.* at 44 (Mr. Clark).)  Mr. Biden's counsel also was clear that this was his understanding from the prosecution: "our understanding of the Diversion Agreement, which is a bilateral agreement between the Defendant and the government which the government has reaffirmed to me it will stand by." (*Id.*)  Although the Prosecution now reverses course and claims the Diversion Agreement never became effective (oddly calling it and the accompanying Plea Agreement "drafts" (DE 32 at 1)), the prosecution said the opposite at the hearing and never attempted to correct Mr. Biden's counsel before the Delaware court.

Even when pressed by the Delaware court as to whether Mr. Biden would challenge the constitutionality of the gun charge, given a recent case finding it unconstitutional, Mr. Biden's counsel responded: "I can tell you our intention would be to abide by the agreement and only raise such constitutional determining at such time that somebody tried to bring any charges on this, otherwise it's an agreement between the parties.  We are going to honor the agreement." (Ex. 1 at 91 (Mr. Clark).)  Nobody—including the prosecution—ever suggested that the Diversion Agreement would become void if the Plea Agreement was not accepted.  Yet the prosecution now seeks to backtrack and renege on its agreement.  The plain language, and various representations made during and after the agreement was entered into (evidenced by contemporaneous communications discussed and referenced in the accompanying Declaration of Christopher Clark), forbid the prosecution from doing so.

## ARGUMENT

## I.   THE DIVERSION AGREEMENT REMAINS IN FORCE

### A. The Diversion Agreement Is An Unambiguous, Binding, And Enforceable Contract

The Supreme Court has authorized prosecutors to enter into contracts with defendants to resolve potential criminal charges, as was done with the Diversion Agreement, and it has made clear that due process principles require prosecutors to honor

their obligations under agreements they reach with defendants.   *See Bordenkircher v. Hayes*, 434 U.S. 357, 362 (1978); *Santobello*, 404 U.S. at 262. "If the government indicts a defendant on charges that the defendant believes are barred by a preexisting plea agreement, the defendant may move to dismiss those charges." *United States v. Plascencia-Orozco*, 852 F.3d 910, 920 (9th Cir. 2017). The parties agree that a Diversion Agreement is legally analogous to a Plea Agreement. (DE 69 at 8 (citing *United States v. Garcia*, 519 F.2d 1343, 1345 n.2 (9th Cir. 1975).)

The Diversion Agreement was validly executed and, therefore, is a binding and enforceable contract. The fact that the Diversion Agreement has been approved and executed by the parties is clear on the face of the Agreement itself. The Diversion Agreement is explicit that the only parties to the Agreement are Mr. Biden and the prosecution (Ex. 2 at I), and both signed the Agreement on July 26, 2023. Neither the Court nor anyone else is a party to the Agreement. The Agreement need only be approved and executed by the parties to become effective, and that has occurred. (*Id.* at II(18).) The Agreement also is explicit that there are no requirements for the Agreement to become effective that are not stated in the Agreement itself. (*Id.* at II(19); *see United States v. Wells*, 124 F. App'x 735, 737 (3d Cir. 2005) (Becker, J.) (explaining that such a clause precludes the court from finding a party "breached an 'implicit' understanding in a plea agreement") (citation omitted); *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 215 (3d Cir. 2005) (Alito, J.) (holding Delaware law prevents looking beyond the "four corners" of a contract with such a clause). The prosecution acknowledges that Delaware law applies to the construction of the agreement and precludes construing the terms of an agreement through parol evidence. (DE 69 at 8-10.) Because Mr. Biden accepted the Diversion Agreement, "the Government may not now revoke it." *United States v. Molina*, No. 7:19-CR-449-3 (NSR), 2023 WL 8188598, at *3 (S.D.N.Y. Nov. 27, 2023) (refusing to allow the prosecution to withdraw a plea agreement after it was accepted because the agreement was not explicitly "contingent" upon anything beyond the parties' signatures, noting "[c]ourts are required to hold the Government to the most

1  meticulous standards of both promise and performance") (quoting *United States v. Gotti*,

2  457 F. Supp. 2d 411, 424 (S.D.N.Y. 2006)).

3      The parties agree that the Diversion Agreement, like any unambiguous contract, is

4  interpreted solely by its plain language.  (DE 69 at 8-10.)  Under Delaware law, courts

5  interpret contracts based on their plain language alone, absent some ambiguity.  *See, e.g.*,

6  *CKSJB Holdings LLC v. EPAM Sys., Inc.*, 837 F. App'x 901, 904-05 (3d Cir. 2020) (citing

7  Delaware law); *Prime Victor Int'l Ltd. v. Simulacra Corp.*, 2023 WL 4546333, at *6 (D.

8  Del. July 14, 2023).  "Ambiguity does not exist simply because the parties disagree about

9  what the contract means.   Moreover, extrinsic, parol evidence cannot be used to

10  manufacture an ambiguity in a contract that facially has only one reasonable meaning."

11  *LPPR, Inc. v. Keller Crescent Corp.*, 532 F. App'x 268, 275 (3d Cir. 2013) (quoting

12  *United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 830 (Del. Ch. Dec. 21, 2007)).

13      Because the Diversion Agreement does not make the effectiveness of the

14  Agreement contingent on anything beyond the approval and execution by all parties to the

15  Agreement, the Agreement was unambiguously executed when it was signed by all parties

16  on July 26, 2023.  No matter how much external criticism the prosecution may face for

17  proposing, drafting and signing this Agreement, it is too late for it to now disclaim its

18  commitments under the Agreement that it struck.

19      **B. To The Extent There Is Any Ambiguity In The Diversion Agreement, It**

20      **Must Be Construed In Mr. Biden's Favor**

21      Not only is it clear from the face of the Diversion Agreement signed by all parties

22  that it is in effect—as all parties told the Delaware court at the July 26, 2023 hearing—

23  any effort by the prosecution to search out some ambiguity in the contract in an effort to

24  manufacture an excuse to renege on the deal it struck would fail.  There is no explicit

25  language in the Diversion Agreement that would allow the prosecution to nullify the

26  Agreement, and nothing less will do.

27      If the prosecution must search out some ambiguity in the Diversion Agreement to

28  exploit in support of its argument, the prosecution has already lost.  Like the Third Circuit,

1   the Ninth Circuit explains: "Courts construe ambiguities in the plea agreement against the
2   government and will use the defendant's reasonable beliefs at the time of pleading to
3   construe the agreement." *United States v. Wingfield*, 401 F. App'x 235, 236 (9th Cir.
4   2010); *see United States v. Jackson*, 21 F.4th 1205, 1213 (9th Cir. 2022) ("Our task is to
5   determine what the defendant reasonably believed to be the terms of the plea agreement
6   at the time of his plea."); *Franco-Lopez*, 312 F.3d at 989 (explaining the court "construe[s]
7   ambiguities in favor of the defendant" (citation omitted) and that, "[i]n construing the
8   agreement we must determine what Franco-Lopez reasonably believed to be the terms of
9   the plea agreement at the time of the plea."). Indeed, the Ninth Circuit has "steadfastly
10  applied the rule that any lack of clarity in a plea agreement should be construed against
11  the government as drafter." *United States v. Spear*, 753 F.3d 964, 968 (9th Cir. 2014)
12  (citations omitted). "Construing ambiguities in favor of the defendant makes sense in light
13  of the parties' respective bargaining power and expertise." *United States v. De La Fuente*,
14  8 F.3d 1333, 1338 (9th Cir. 1993). The prosecution does not dispute that this is the law;
15  it claims the contract unambiguously gave Probation veto power over the Agreement
16  between the parties despite being unable to point to any provision of the Agreement that
17  says so. (DE 69 at 8-10.)

18      Here, it was the prosecution that pushed Mr. Biden to adopt what the Delaware
19  court found to be a rather unusual sort of Diversion Agreement. (Ex. 1 at 10 (Court
20  explaining that some provisions are "not standard and different from what I normally
21  see"); 41 (Court noting the immunity provision in the Diversion Agreement "is normally
22  in a plea agreement"); 45 (Court explaining it reviewed several diversion agreements "and
23  couldn't find anything that had anything similar to that").) The prosecution acknowledged
24  that this Diversion Agreement is without precedent and that it "was crafted to suit the facts
25  and circumstances" of this case. (*See* Ex. 1 at 95; *see id.* at 94 ("No, I don't have
26  precedent.") (Mr. Wise); 103 (Court acknowledging no precedent).) To be clear, after the
27  prosecution insisted on structuring the Diversion Agreement and the Plea Agreement in
28  this non-traditional manner, Mr. Biden and his counsel agreed to this approach because

they were assured it would protect Mr. Biden's rights.  (Ex. 4 ¶25 (the prosecution "had proposed a bifurcated set of agreements and told defense counsel that it had to work within this bifurcated agreement structure").)

Mr. Biden gave up rights and agreed to the prosecution's rendition of facts.  It is fundamentally unfair for the prosecution to extract these concession and statements from a defendant based on a promise that the prosecution later chooses not to honor, no matter how great the political pressure exerted upon the prosecution.  As the drafter of this proposal, and the beneficiary of Mr. Biden's concessions under the Diversion Agreement, the Diversion Agreement should be construed against the prosecution to provide Mr. Biden the benefit of his bargain.

### C. The Prosecution's New Claim That The Diversion Agreement Is Not In Effect Conflicts With Its Prior Statements

In asking the court to vacate the briefing it had requested on the validity of the Plea Agreement (not the Diversion Agreement), the prosecution began swimming through excuses for why the Diversion Agreement was not valid.  After telling the court that the Diversion Agreement had been executed by the parties and is in force—and further conveying that impression by not correcting Mr. Biden's counsel when they made the same representations to the court—the prosecution reversed course after the hearing when Mr. Weiss came under blistering attack for making the deal.  Although the facts that had been determined through a five-year investigation had not changed, several Republican Members of Congress and several right-wing media pundits criticized the prosecution, and suddenly the prosecution decided that it no longer wanted the court to approve the Plea Agreement that it had negotiated and that easily could have been modified to address the court's concerns.[6]  More remarkably, the prosecution decided that it no longer wanted to

---

[6] For example, the Plea Agreement could have explicitly stated that the prosecution could bring a declaratory judgment action alleging that Mr. Biden had breached the Diversion Agreement, and then brought new charges if the Court agreed that a breach had occurred. Because this remedy is available as a matter of contract law, it could be used by the prosecution to enforce the Agreement even without any modification of the Diversion Agreement's language.  *See, e.g., Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306 (3d Cir. 2007) (allowing declaratory judgment claim for alleged breach of contract).

be bound by the Diversion Agreement that already was in effect, going so far as to mischaracterize the signed Agreement filed with the court as a "draft." (DE 32 at 1.)

The prosecution pretends that it did not represent to the court that the Diversion Agreement was in effect (DE 32 at 1), but the transcript of the hearing proves otherwise. Again, Mr. Wise told the court, using the *present tense*: "Your Honor, the Diversion Agreement *is* a contract between the parties so it's in effect until it's either breached or a determination [of breach has been made], period." (Ex. 1 at 91 (Mr. Wise) (emphasis added).) Nevertheless, the prosecution has not alleged that Mr. Biden has breached the Diversion Agreement. To the contrary, Mr. Biden agreed to its terms on July 26, 2023, sacrificed his constitutional rights, and has complied with all requests from Probation since then.

The prosecution now refers to the Diversion Agreement as a "withdrawn proposed diversion agreement" (DE 69 at 1), but Paragraph 19 of the Diversion Agreement does not allow the prosecution to unilaterally "withdraw" from the Agreement after it has been agreed to and signed by the parties. Rather, Paragraph 19 directs that "no future modifications . . . shall be valid unless they are set forth in writing and signed by" the prosecution, Mr. Biden, and Mr. Biden's counsel. No such written modification has been made or signed by Mr. Biden or his counsel.

Most bizarrely, the prosecution initially pointed to a line in the hearing transcripts that it italicizes for emphasis in which Mr. Wise said, "if your honor takes the plea *and signs the Diversion Agreement which is what puts it into force as of today*," claiming this shows the Diversion Agreement was not in effect. (DE 32 at 5 (quoting Ex. 1 at 53).) To put it bluntly, that is ridiculous. Mr. Wise obviously misspoke in court in saying "Diversion Agreement," rather than "Plea Agreement." The whole discussion was about the consequences of the court accepting the Plea Agreement, which would have made the Plea Agreement effective that day. Mr. Wise cannot invoke his own misstatement to overrule his repeated statements that the Diversion Agreement was between the parties and only the Plea Agreement needed the Delaware court's approval. Subsequently, in

12

defending against a motion to dismiss in Delaware based on the Diversion Agreement, the prosecution abandoned this initial excuse in search of another.

At the hearing, the Delaware court was clear that there was no place for it to sign the Agreement, which the prosecution acknowledged. (Ex. 1 at 50 (Court explaining "you are not asking me to sign off on" the Diversion Agreement), 92 (Court explaining the Diversion Agreement is "a separate agreement, there's no place for me to sign off on it"). Mr. Wise may want to use his slip of the tongue confusing the Plea Agreement with the Diversion Agreement now, but at the time he explicitly told the court: "[W]e are not asking the Court to rule in any way on the Diversion Agreement." (*Id.* at 51.) Only the Plea Agreement required a signature from the court. Consequently, no rational observer of the hearing would have understood that the prosecution expected the court to rule on the Diversion Agreement and "sign off on it." It is just as the prosecution told Mr. Biden's counsel before the hearing; the Diversion Agreement "resolved" the gun charges. (Ex. 4 ¶36) and resulted in the only the possibility of misdemeanor tax charges in Delaware.

**D. It Makes No Difference That Probation Did Not Sign The Diversion Agreement**

After extracting the bulk of the benefit of the bargain from Mr. Biden signing the Diversion Agreement, attesting to the accuracy of the Statement of Facts alleged by the prosecution, the prosecution now suggests that its extraction of Mr. Biden's rights was some sort of gotcha-moment. (DE 32 at 1.) The prosecution now claims that although *every* party to the Diversion Agreement, including the prosecution, signed the Diversion Agreement, it never became effective because Probation, a non-party, did not sign the Agreement. In the Prosecution's mind, that means that it was able to extract Mr. Biden's obligations and waivers by making an illusory promise of immunity. The prosecution's theory would truly shock the conscience and violate the Due Process Clause if it were correct, but Probation's recommendation and approval were given, and even that was not necessary to create a binding contract among the parties in any event.

### 1. Probation Was Not A Party To The Agreement

No signature from Probation was required because Probation is expressly *not* a party to the Diversion Agreement. (Ex. 2 at I.)   The Diversion Agreement became effective once it was approved and executed by *the parties* to the Agreement.   No provision of the Diversion Agreement states otherwise; nor did the prosecution say otherwise at the hearing.

The prosecution highlights that the diversion period under the Diversion Agreement does not begin until the date of execution and "approval" of the Diversion Agreement (Ex. 2 at II(2)) and claims the Agreement was never approved by Probation (DE 32 at 6), but the Diversion Agreement required execution and approval from the parties—not by Probation.   Again, the Diversion Agreement is explicit that only Mr. Biden and the prosecution are parties to the Diversion Agreement, and there is no provision that says Probation must sign the Diversion Agreement for it to be effective.

The Diversion Agreement would have stated that a signature from Probation was necessary to make it effective if that was what the parties intended.   Paragraph 19, for example, which addresses modifications to the Diversion Agreement, states that such changes must be "in writing and *signed by the United States, Biden, and Biden's counsel*." (Ex. 2 at II(19) (emphasis added).)   Thus, the Diversion Agreement plainly contemplates when a signature is needed, and yet there is no provision requiring that the Diversion Agreement be "signed" by Probation to be effective.

Even more tellingly, when a "signature" is required for changes to be effective, the Diversion Agreement specifies that *only* the signatures of the parties and Mr. Biden's counsel are necessary.   Probation's signature is not.   It makes no sense to view Probation's signature as necessary to make the Diversion Agreement effective between the actual parties, and for the Diversion Agreement to then give the parties the power to redraft the entire Agreement (including expanding Probation's authority or removing it all together) without any sign-off from Probation.   Probation's approval is hardly critical to the Agreement if it can so easily be dispensed with.

There is no riddle here to be solved though because, as Mr. Wise explained, the Diversion Agreement is "a bilateral agreement between the parties" (Ex. 1 at 46), so Probation's signature was never needed to make the Diversion Agreement or any modifications to it effective. "Bi-lateral" means two and "parties" was defined to mean the prosecution and Mr. Biden. That makes sense because Probation is *not* a party to the Agreement and Probation is *not* required to do anything under this Agreement. To be sure, Probation is empowered by the Diversion Agreement to supervise Mr. Biden "as directed" by Probation. (Ex. 2 at II(10)(a).) Probation also could require Mr. Biden to submit to substance-abuse testing and treatment "as directed" by Probation. (*Id.* at II(10)(e).) And Mr. Biden must communicate his travel plans to Probation and, if requested by Probation, provide supporting documentation. (*Id.* at II(10)(g).) But Probation is not required to do any of these things, or anything at all, under this Diversion Agreement; it merely has the parties' consent to do so. Mr. Biden has agreed to give Probation that power over him, and it is hardly a breach of the Agreement by him if Probation chooses not to exercise that power.

At the hearing, the prosecution acknowledge that Probation had no role in determining whether the Diversion Agreement struck a fair bargain for the government. Mr. Wise told the court: "I believe that this is a bilateral agreement between the parties that the parties view in their best interest. I don't believe that the role of probation would include weighing whether the benefit of the bargain is valid or not from the perspective of the United States or the Defendant." (Ex. 1 at 46 (Mr. Wise).) The only role for Probation is to supervise Mr. Biden, if it chooses to do so, but the Diversion Agreement between the parties remains valid even if Probation decided not to supervise Mr. Biden at all. Nevertheless, Probation officers based in the Central District of California have continued to supervise Mr. Biden since July 26, including, for example, making home visits and having him submit to drug tests.

The signature line for Probation reflecting its approval would indicate only that Probation approved being given this supervisory responsibility, which even then it would

15

not have to exercise. Because Probation was not a party to the Agreement, its approval was not necessary for the Agreement to be effective. With the Diversion Agreement in effect, Probation could always decide to exercise its supervisory authority over Mr. Biden under that Agreement at a later time, even if it had not previously signed the Diversion Agreement or never did so.

Importantly, Mr. Biden has satisfied his obligations under the Diversion Agreement by agreeing to be subject to these oversight provisions by Probation and he has done everything Probation has asked of him. If Probation had never chosen to exercise any of its rights under the Agreement, that would not diminish the fact that Mr. Biden agreed to be subject to oversight by Probation. That is all the Diversion Agreement required of him.

## 2. Probation, In Fact, Approved The Diversion Agreement

Having argued that Probation had to approve the agreement, its subsequent suggesting that Probation did not approve the Diversion Agreement is farcical because both Probation and the prosecution told the Delaware court that it did. As noted above, Probation sent the court a copy of Mr. Biden's Pretrial Diversion Report on July 19, 2023. (Ex. 5.) The Report conveys the following Recommendation: "The United States Probation Office *recommends* the defendant as a candidate for a 24-month term of Pretrial Diversion." (*Id.* ¶37 (emphasis added).) The Report attaches the then-proposed Diversion Agreement, and notes that Mr. Biden agreed with the factual statement. (*Id.* ¶35.) However the prosecution may try to spin this, it is not possible that Probation was not "agreeing" with something it was "recommending." A recommendation reflects more than passive agreement.

Were Probation's approval needing any more evidence, on July 20, 2023, the prosecution emailed the court to report that "[t]he parties *and Probation have agreed* to revisions to the diversion agreement to more closely match the conditions of pretrial release that Probation recommended in the pretrial services report issued yesterday." (Ex. 4 at 160 (Clark Decl., Ex. T) (emphasis added).) Plainly then, the parties understood that

Probation had *agreed* to the Diversion Agreement, and the prosecution advised both the court and Mr. Biden's counsel of that fact.

The prosecution emphasizes that Probation did not sign the Diversion Agreement but, again, no provision of the Diversion Agreement requires anything more than the approval and execution of the Agreement by the parties for it to be effective. To the extent that Probation's approval was necessary, it was conveyed by Probation's recommendation of the Diversion Agreement to the court and its assurance to the prosecution, which it conveyed to the court by email and in signing the letter recommending the Agreement.

"Nothing in the law of contracts requires that a contract be signed to be enforceable." *Whittington v. Dragon Group LLC*, 2013 WL 1821615, at *3 (Del. Ch. May 1, 2013) (citing Delaware authority); *see Harrison v. Dixon*, 2013 WL 4759681, at *3 (Del. Ch. Sept. 5, 2013). Not only is that true in Delaware, it is black-letter law. *See, e.g.*, *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319 (1919) (explaining "[i]t makes no difference that the contract was not formally signed" because the intent to be bound was manifested by making the offer of a contract); *Carroll v. Peake*, 26 U.S. 18, 22 (1828) (finding a contract although it had not been signed); *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 649 (7th Cir. 2001) ("Nothing in the law of contracts requires that a contract, whether original or modified, must be signed to be enforceable. The contract needn't be in writing; if it is in writing, it needn't be signed, provided there's other evidence of acceptance."); *Roadway Express, Inc. v. Gen. Teamsters, Chauffeurs, and Helpers Union*, 330 F.2d 859, 863 (3d Cir. 1964) ("So the fact that the proposed written agreement was not signed did not demonstrate as a matter of law that was no contract."). To be sure, a signature on a contract is a common and strong indication that a party has agreed to a contract, but it is not the only way that assent to be bound by a contract is manifested. *See, e.g.*, *In re Wash. Mut., Inc.*, 421 B.R. 143, 148 (Bankr. D. Del. 2009). The fact that Probation sent its written recommendation in favor of the Diversion Agreement to the parties and the court and told the parties that it *agreed*

1  with the Diversion Agreement, is sufficient to the extent a manifestation of Probation
2  taking on its supervisory responsibility was needed.

3      Also, to the extent a signature from Probation was needed for its non-party role, that
4  exists too on Ms. Bray's signed July 19, 2023 letter to counsel for the parties enclosing
5  her recommendation in favor of the Diversion Agreement and copy of the Agreement.
6  The fact that Ms. Bray signed her letter recommending the Diversion Agreement, and
7  enclosed a copy of it, is a powerful indicator that she gave her approval.

8      **E. Judicial Estoppel Precludes The Prosecution From Denying The**
9          **Validity Of The Diversion Agreement Or Probation's Approval**

10     The doctrine of judicial estoppel prevents the prosecution from denying that the
11  Diversion Agreement is valid or that Probation has agreed to the Diversion Agreement
12  because it told the Delaware court otherwise. *See, e.g.*, *New Hampshire v. Maine*, 532
13  U.S. 742, 749 (2001). When it suited the prosecution's interests, and it wanted the court
14  to accept the Plea Agreement on the misdemeanor tax charge Information, the prosecution
15  told the court that the Diversion Agreement was in effect and had the support of Probation.
16  Now that the prosecution has backtracked from the settlement framework embodied in the
17  Plea Agreement, the prosecution no longer wants to be bound by its Diversion Agreement
18  either, so now it claims the Diversion Agreement is not in effect and that actual approval
19  was needed and not given by Probation. Judicial estoppel prevents a party from playing
20  fast and loose with the facts, particularly when the facts have not changed, only the
21  prosecution's political appetite has changed. *Id.*

22     Moreover, judicial estoppel is particularly warranted when "the party seeking to
23  assert an inconsistent position would derive an unfair advantage or impose an unfair
24  detriment on the opposing party if not estopped." *Id.* at 751. That is the case here. The
25  prosecution used the immunity promised by the Diversion Agreement to elicit Mr. Biden's
26  agreement with the facts it wrote and waiver of rights with respect to gun (and tax and
27  drug) charges, which Mr. Biden then elaborated upon in response to extensive questioning
28  from the Court. (Ex. 1 at 61–80.) Defense counsel would not have allowed Mr. Biden to

1    waive his rights and discuss these issues absent the prosecution's acknowledgment that
2    the Diversion Agreement was in effect, such that Mr. Biden could provide such testimony
3    under the immunity provided by the Diversion Agreement. Accordingly, fairness dictates
4    that the prosecution be held to its promise.

5    **II.    THE DIVERSION AGREEMENT'S IMMUNITY PROVISION REQUIRES**
6    **        DISMISSAL OF THE INDICTMENT**

7         Paragraph 15 of the Diversion Agreement provides "broad immunity," as the
8    Delaware court recognized. (Ex. 1 at 83; *see id.* at 46 ("so broad that it encompasses
9    crimes in another case").) The Paragraph precludes prosecution "for any federal crimes
10   encompassed" by the Statement of Facts attached to the Diversion Agreement and the Plea
11   Agreement (with no requirement that the court adopt the Plea Agreement; the Plea
12   Agreement's Statement of Facts is incorporated directly into this provision of the
13   Diversion Agreement).

14        Even the prosecution seems to agree that, if the Diversion Agreement is valid, the
15   Indictment it has filed in this Court is prohibited by that Agreement. As the prosecution
16   told the Delaware court, thus immunity "includes tax charges in that [2014-2019] time
17   period" (Ex. 1 at 58 (Mr. Wise); *id.* at 57 (Mr. Biden's counsel agreeing with the
18   prosecution that the immunity "broadly relate[s] to gun possession, *tax issues*, and drug
19   use") (emphasis added).) Obviously, all three charges in the Indictment concern taxes in
20   the time period addressed by the Agreement. Therefore, the Indictment must be dismissed.

21        Given the prosecution's promise of immunity in exchange for Mr. Biden giving up
22   so many of his rights as part of the Diversion Agreement, "such promise must be fulfilled."
23   *Santobello*, 404 U.S. at 261; *see also Bordenkircher*, 434 U.S. at 362. That necessitates
24   the dismissal of the Indictment.[7]  *See, e.g., Plascencia-Orozco*, 852 F.3d at 920; *United*

25

---

26   [7] The extensive negotiations between U.S. Attorney Weiss, AUSAs Lesley Wolf and Carly
     Hudson, and Mr. Biden's counsel regarding the prosecution's immunity promise and the
27   crafting of that provision in the Diversion Agreement is discussed in detail in the Clark
     Declaration. (*See* Ex. 4 ¶¶20–23, 27–30.) As noted above, the terms of the agreement
28   themselves support dismissal of the Indictment. Contemporaneous communications by
     the USAO to Mr. Clark confirm this required result.

*States v. Lamanna*, 2016 WL 616580, at \*1 (W.D. Pa. Feb. 16, 2016) ("dismiss[ing] the Indictment . . . on due process grounds" where government obtained indictment, in breach of an existing agreement between government and defendant).

## CONCLUSION

Mr. Biden, one party, struck a deal with the prosecution, the other party, through the Diversion Agreement. As part of that Agreement, he sacrificed valuable rights in exchange for the prosecution's agreement not to prosecute the very sort of Indictment that it has brought here. The prosecution's desire to take political cover from the criticism leveled against it does not provide a legal basis for them to renege on the Diversion Agreement it explained to the Delaware court it had made. This Court should require the prosecution honor its agreement and dismiss the Indictment.

Dated:  February 20, 2024                Respectfully submitted,


By: */s/ Angela M. Machala*
Angela M. Machala (SBN: 224496)
AMachala@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Fl.
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile:  (213) 615-1750


Abbe David Lowell (*admitted pro hac vice*)
AbbeLowellPublicOutreach@winston.com
Christopher D. Man
CMan@winston.com
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
Telephone : (202) 282-5000
Facsimile:   (202) 282-5100


*Attorneys for Robert Hunter Biden*