1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,          Case No. 2:23-cr-00599-MCS-1
11                    Plaintiff,        **ORDER ON MOTIONS TO DISMISS**
12                                       **(ECF NOS. 25–32)**
13            v.
14   ROBERT HUNTER BIDEN,
15                    Defendant.
16
17
18
19
20
21
22
23
24
25
26
27
28

The Government accuses Defendant Robert Hunter Biden of: willfully failing to pay at least $1.4 million in federal taxes he owed for tax years 2016–2019 in violation of 26 U.S.C. § 7203, willfully failing to file tax returns for tax years 2017 and 2018 in violation of 26 U.S.C. § 7203, tax evasion for tax year 2018 in violation of 26 U.S.C. § 7201, and filing false and fraudulent tax forms for tax year 2018 in violation of 26 U.S.C § 7206. On December 7, 2023, a grand jury in the Central District of California returned an indictment against Defendant containing three felony counts and six misdemeanor counts. (Indictment, ECF No. 1.) In a pending proceeding in the United States District Court for the District of Delaware, the Government charges Defendant with making false and fictious statements on ATF Form 4473 in connection with Defendant's purchase of a firearm in Delaware and illegally possessing a firearm as a user of controlled substances. Indictment, *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del. Sept. 14, 2023), ECF No. 40.

Defendant filed eight motions to dismiss the Indictment in this action. They are:

(1)  Motion to Dismiss the Indictment Based on Immunity Conferred by Defendant's Diversion Agreement (ECF No. 25);

(2)  Motion to Dismiss the Indictment Because Special Counsel Weiss was Unlawfully Appointed and the Prosecution Violates the Appropriations Clause (ECF No. 26);

(3)  Motion to Dismiss the Indictment for Selective and Vindictive Prosecution and Breach of Separation of Powers (ECF No. 27);

(4)  Motion to Dismiss the Indictment for Due Process Violations Based on Outrageous Government Conduct (ECF No. 28);

(5)  Motion to Dismiss Count 1 as Untimely or, in the Alternative, to Dismiss All Counts for Failure to State a Claim and Lack of Specificity (ECF No. 29);

(6)  Motion to Dismiss Counts 2, 4, and 6 of the Indictment in Part for Duplicity (ECF No. 30);

(7)     Motion to Dismiss Count 9 of the Indictment for Selective Prosecution (ECF No. 31); and

(8)     Motion to Dismiss Counts 1–4 for Improper Venue (ECF No. 32).[1]

The motions are fully briefed. The Court heard extensive oral argument on March 27, 2024. (*See* Mins., ECF No. 64.)

## I.     BACKGROUND[2]

At least as early as the summer of 2021, and continuing through the summer of 2023, Defendant, represented by attorney Christopher Clark, was in discussions with attorneys from the United States Attorney's Office for the District of Delaware concerning the Government's tax-related allegations underlying the Indictment in this action. As part of these discussions, Defendant made presentations to the Government regarding the very allegations and evidence contained within the Indictment. (*See* Selective Prosecution Mot. 2–3, ECF No. 27.) To facilitate the ongoing discussions, Defendant entered into tolling agreements with the United States Attorney's Office for the District of Delaware and the United States Department of Justice, Tax Division, tolling the statues of limitations on any potential tax charges from July 1, 2021, through March 1, 2022, and from March 2, 2022, through June 15, 2022. (*See* SOL Opp'n Exs. 1–2, ECF Nos. 38-1 to 38-2.) The discussions between the Government and Defendant during this time included both misdemeanor tax violations (willful failure to file and willful failure to pay in violation of 26 U.S.C. § 7203) and felony tax violations (tax evasion in violation of 26 U.S.C. § 7201, filing a false return in violation of 26 U.S.C.

---

[1] Defendant filed a ninth motion, Motion to Strike Surplusage, (ECF No. 33), which the Court resolved in a separate order, (*see* ECF No. 34).

[2] To provide context for the remainder of this Order, the Court sets out a brief background of undisputed events leading up to the Indictment. Where appropriate, a more detailed recitation of facts is included within the discussion of the Court's determination of each motion.

§ 7206, and assisting in the preparation of a false return in violation of 26 U.S.C. § 7206). (*Id.*) At the same time, Defendant and the Government were also discussing potential charges related to a firearm offense. (*See* Machala Decl. Ex. 4 ("Clark Decl.") ¶ 10, ECF No. 25-5.)

By late July 2023, Defendant and the Government reached agreement on a resolution of the tax charges and the firearm charges memorialized in two separate agreements: a memorandum of plea agreement resolving the tax offenses, (Machala Decl. Ex. 3 ("Plea Agreement"), ECF No. 25-4), and a deferred prosecution agreement, or diversion agreement, addressing the firearm offenses, (Machala Decl. Ex. 2 ("Diversion Agreement"), ECF No. 25-3).

As part of the Plea Agreement, Defendant agreed to waive any venue challenge that could arise from the tax charges being adjudicated in Delaware, (Plea Agreement § 1), and agreed to plead guilty to two counts of willful failure to pay taxes in violation of 26 U.S.C. § 7203, (*id.* § 3). Defendant also agreed to a statement of facts supporting the misdemeanor and felony counts present in the Indictment in the present action. (*Id.* § 3 & Ex. 1.)

As part of the Diversion Agreement, the Government agreed to dismiss the firearm related charges after a two year diversion period, (Diversion Agreement § II(4)), during which Defendant agreed to comply with a number of terms and conditions, (*id.* §§ II(9)–(10)). Defendant also agreed to a statement of facts supporting the firearm-related charges. (*Id.* § II(11) & Attach. A.) The Diversion Agreement further included a dispute resolution procedure by which the Government could seek a determination by the United States District Court for the District of Delaware that Defendant had breached his obligations under the Diversion Agreement. (*Id.* § 14.) Upon a finding of breach by the Delaware district court, the Government would have the option of prosecuting Defendant for any federal criminal violation of which the Government had knowledge. (*Id.* § II(14)(b).) Finally, assuming Defendant complied with the terms of the Diversion Agreement, the agreement granted Defendant immunity for any federal

4

crimes encompassed by the statement of facts in the Plea Agreement, (Plea Agreement Ex. 1), and the statement of facts in the Diversion Agreement, (Diversion Agreement Attach. A).

The parties submitted the Plea Agreement and the Diversion Agreement to United States District Judge Maryellen Noreika in advance of a scheduled July 26, 2023, Initial Appearance and Plea Hearing. (*See* Machala Decl. Ex. 1 ("Del. Hr'g Tr."), ECF No. 25-2.) At the hearing, after questioning Defendant and the parties, the District Court Judge expressed concerns regarding both Defendant's understanding of the scope of the immunity offered by the Diversion Agreement and the appropriateness of the District Court's role in resolving disputes under the Diversion Agreement. (Del. Hr'g Tr. 103–08.) The District Court Judge asked the parties to rework the agreements and provide additional briefing regarding the appropriate role of the District Court in resolving disputes under the Diversion Agreement. (*Id.*) At the hearing, Defendant entered a plea of not guilty to the tax charges then pending in Delaware. (*Id.* at 109.)

After the hearing in Delaware, the parties exchanged communications regarding proposed changes to the Diversion Agreement and the Plea Agreement. (*See, e.g.*, Lowell Decl. Ex. B, ECF No. 48-3 (August 7, 2023 Letter from Christopher J. Clark to Leo J. Wise, ECF 48-3); Def.'s Suppl. Ex. C, ECF No. 58-1 (August 9, 2023 Letter from Leo J. Wise to Christopher J. Clark).) On August 11, 2023, Attorney General Merrick Garland appointed United States Attorney David Weiss as Special Counsel to continue his investigation of Defendant. The same day, the Government moved to dismiss the tax information in Delaware without prejudice. Mot. to Voluntarily Dismiss Criminal Tax Information, *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del. Aug. 11, 2023), ECF No. 31. On August 15, 2023, Mr. Clark moved to withdraw from his representation of Defendant, and Abbe Lowell took primary responsibility for further negotiations with the Government on Defendant's behalf. *See* Mot. for Leave to Withdraw as Counsel, *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del. Aug. 15, 2023), ECF No. 38. At an August 29, 2023, meeting between Mr. Lowell and attorneys

5

1  from the Office of Special Counsel, it became apparent to the parties that they had

2  reached an impasse. (Lowell Decl. ¶¶ 3–5, ECF No. 48-1.) The Special Counsel

3  subsequently convened a grand jury in the Central District of California, leading to the

4  Indictment in this action.

5

6  **II.  MOTION TO DISMISS THE INDICTMENT BASED ON IMMUNITY**

7  **CONFERRED BY DEFENDANT'S DIVERSION AGREEMENT (ECF**

8  **NO. 25)**

9  Defendant argues that the indictment violates the Diversion Agreement he

10  entered into with the Government that confers immunity from the charged crimes. (*See*

11  *generally* Immunity Mot., ECF No. 25.) The Government contends that the Diversion

12  Agreement never became effective because a condition precedent to its formation was

13  not met, and the Government thus was free to withdraw its assent to the agreement. (*See*

14  *generally* Immunity Opp'n, ECF No. 35.)

15

16  **A.  Legal Standard**

17  "[A] criminal defendant has a due process right to enforce the terms of his plea

18  agreement." *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006) (en banc) (citing

19  *Santobello v. New York*, 404 U.S. 257, 261–62 (1971)). "If the government indicts a

20  defendant on charges that the defendant believes are barred by a preexisting plea

21  agreement, the defendant may move to dismiss those charges." *United States v.*

22  *Plascencia-Orozco*, 852 F.3d 910, 920 (9th Cir. 2017). A "deferred prosecution

23  agreement is analogous to a plea bargaining agreement" in the context of a motion to

24  dismiss an indictment under these principles. *United States v. Garcia*, 519 F.2d 1343,

25  1345 & n.2 (9th Cir. 1975); *see also United States v. Shapiro*, 879 F.2d 468, 470–71

26  (9th Cir. 1989) (extending these principles broadly to "agreements made by prosecutors

27  upon which defendants have justifiably relied to their detriment").

28

6

**B.** **Discussion**

1. Overview of the Diversion Agreement

As relevant to the motion, the Diversion Agreement identifies its parties as the United States of America and Robert Hunter Biden. (Machala Decl. Ex. 2 ("Diversion Agreement") § I, ECF No. 25-3.) Section II of the agreement contains its "TERMS AND CONDITIONS," which include definitions of its term and diversion period:

> 1. The term of this Agreement shall be twenty-four (24) months, beginning on the date of approval of this Agreement, unless there is a breach as set forth in paragraphs 13 and 14. Obligations hereunder survive the term of this Agreement only where this Agreement expressly so provides.
>
> 2. The twenty-four (24) month period following the execution and approval of this Agreement shall be known as the "Diversion Period."

(*Id.* §§ II(1)–(2).) In the agreement, Defendant agreed to waive indictment, (*id.* § II(3)); subject himself to the jurisdiction of the federal trial court in Delaware, (*id.* § II(8)); subject himself to pretrial diversion supervision, (*id.* § II(10)); and acknowledge the truthfulness and accuracy of, and decline to repudiate or contradict, an attached statement of facts setting forth information relating to the firearm charges, (*id.* § II(12)).

In turn, the United States agreed not to criminally prosecute Defendant for any federal crimes encompassed by the statement of facts attached to the Diversion Agreement and the statement of facts attached to the Plea Agreement. (*Id.* § II(15).) The latter statement encompasses the facts relevant to the tax charges in this matter. (*See* Machala Decl. Ex. 3, at Ex. 1, ECF No. 25-4.) Notably, the Diversion Agreement incorporates the statement of facts attached to the Plea Agreement without regard to whether the Delaware District Court accepted a plea pursuant to the Plea Agreement.

The Diversion Agreement sets forth a process by which the Delaware District Court would determine whether Defendant committed a knowing, material breach of

7

1  the agreement upon request of the United States. (Diversion Agreement § II(14).) The

2  agreement also provides for execution in counterparts, (*id.* § II(18)); contains an

3  integration clause, (*id.* § 19); and authorizes modifications "set forth in writing and

4  signed by the United States, Biden, and Biden's counsel," (*id.*).

5        The signature page contains signature blocks for "the Parties"; the block for the

6  United States bears a signature of a Special Assistant United States Attorney and date

7  of July 26, 2023, and the block for Defendant bears the signature of Defendant and his

8  counsel. (Diversion Agreement 9.)[3] A third signature block, introduced by the text

9  "APPROVED BY" and providing a line for the signature of Margaret M. Bray, Chief

10  United States Probation Officer of the District of Delaware, is blank. (*Id.*)

11        The Government and Defendant both claim the agreement is unambiguous, but

12  each party's interpretation of the instrument stands in stark contrast to the other's. The

13  Government asserts that the Probation Officer's approval of the Diversion Agreement

14  was a condition precedent to its formation. (Immunity Opp'n 12–17.) Per this argument,

15  because the Probation Officer never affixed her signature to the "APPROVED BY"

16  block, the Diversion Agreement never existed as a binding contract. (*Id.* at 6–12.) On

17  the other hand, Defendant asserts that the Probation Officer's assent to the agreement

18  was not a condition of its formation, and that only the parties, and not the Probation

19  Officer, needed to approve the Diversion Agreement for its terms to take effect.

20  (Immunity Mot. 8–9, 13–16.) Defendant further asserts that the Probation Officer

21  approved the Diversion Agreement by issuing a recommendation of pretrial diversion

22  consistent with the agreement. (*Id.* at 16–18; *see* Machala Decl. Ex. 5, ECF No. 25-6.)

23        From the parties' positions, the Court perceives three issues ripe for

24  interpretation: first, whether the word *approval* as used in the agreement refers to

25  approval by the Probation Officer or by the parties; second, whether *approval* could be

26

27  ───────────────

28  [3] The signature under Defendant's block does not bear a date, but the Court understands Defendant and his counsel affixed their marks on July 26, 2023. (Clark Decl. ¶ 43.)

1    obtained only by signature or by other means; and third, whether *approval* was a

2    condition precedent to formation of the agreement or to performance of its terms.

3

4              2.    <u>Legal Standard Governing Interpretation</u>

5          The parties agree that the Diversion Agreement is subject to standard contract

6    interpretation rules. Which contract interpretation rules the parties contend apply here,

7    however, is unclear. The parties cite authorities applying federal law, (*e.g.*, Immunity

8    Mot. 10; Immunity Opp'n 7); Delaware law, (*e.g.*, Immunity Mot. 9; Immunity Opp'n

9    7); and California law, (*e.g.*, Immunity Opp'n 12–13).

10         The Ninth Circuit has its own "settled" "methodology for interpreting a plea

11   agreement." *Doe v. U.S. Dist. Ct. (In re Doe)*, 57 F.4th 667, 674 (9th Cir. 2023). "[P]lea

12   agreements are contractual in nature and are measured by contract law standards,"

13   including "traditional contract principles" pertaining to construction of terms and

14   obligations. *United States v. Clark*, 218 F.3d 1092, 1095 (9th Cir. 2000) (internal

15   quotation marks omitted). But "[t]he analogy to contract law is . . . in certain

16   circumstances imperfect, and [federal courts] do not always follow it." *United States v.*

17   *Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006). Given concerns about the

18   defendant's constitutional rights at play, "the honor of the government, public

19   confidence in the fair administration of justice, and the effective administration of

20   justice in a federal scheme of government," courts "hold[] the Government to a greater

21   degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea

22   agreements" than they would a drafting party to a commercial contract. *Clark*, 218 F.3d

23   at 1095 (internal quotation marks omitted). "As a defendant's liberty is at stake, the

24   government is ordinarily held to the literal terms of the plea agreement it made, so that

25   the government gets what it bargains for but nothing more." *Transfiguracion*, 442 F.3d

26   at 1228 (citations and internal quotation marks omitted).

27         "[S]everal well-established rules of interpretation" govern interpretation of a plea

28   agreement:

1     If the terms of the plea agreement on their face have a clear
2     and unambiguous meaning, then this court will not look to
3     extrinsic evidence to determine their meaning. If, however, a
4     term of a plea agreement is not clear on its face, we look to
5     the facts of the case to determine what the parties reasonably
6     understood to be the terms of the agreement. If, after we have
7     examined the extrinsic evidence, we still find ambiguity
8     regarding what the parties reasonably understood to be the
9     terms of the agreement, then the government ordinarily must
10    bear responsibility for any lack of clarity. Construing
11    ambiguities in favor of the defendant makes sense in light of
12    the parties['] respective bargaining power and expertise.

13    *Clark*, 218 F.3d at 1095 (citations and internal quotation marks omitted).

14         The parties have not identified, and the Court has not uncovered, binding circuit

15    authority extending these interpretation principles to pretrial diversion agreements. But

16    several other circuit courts have found diversion agreements analogous to plea

17    agreements and construed them according to similar contract principles. *E.g.*, *United*

18    *States v. Harris*, 376 F.3d 1282, 1287 (11th Cir. 2004) ("[T]his court interprets a pretrial

19    diversion agreement applying the same standards we would use to interpret a plea

20    agreement."); *Aschan v. Auger*, 861 F.2d 520, 522 (8th Cir. 1988) (applying contract

21    principles, reasoning that "[t]he pre-trial diversion agreement is analogous to a plea

22    agreement"); *cf. Garcia*, 519 F.2d at 1345 & n.2 (similarly analogizing a deferred

23    prosecution agreement to a plea bargaining agreement). The Court perceives no

24    meaningful distinction between plea and diversion agreements relevant to the

25

26

27

28

application of these interpretation principles. Accordingly, the Court applies the framework set forth in *Clark* to its interpretation of the Diversion Agreement.[4]

### 3.   Application of Interpretation Rules

The Court need not consult extrinsic evidence because the Diversion Agreement is unambiguous with respect to the issues for interpretation outlined above.[5] But both parties miss the mark with their proffered interpretations in some respects. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous . . . .").

### a.   *Meaning of Approval*

Defendant argues that the *approval* to which the Diversion Agreement refers in sections II(1)–(2) is the approval by the parties as memorialized by the signatures affixed to the contract. (Immunity Mot. 14–16.) The Government asserts that *approval* refers to the approval by the Probation Officer, which could be memorialized only by

---

[4] *Clark* and its progeny constitute a relatively small universe of binding cases interpreting plea agreements, and the parties relied extensively on authorities interpreting state law in their briefs. Principles of circuit law governing interpretation of plea agreements appear generally consistent with civil contract principles under federal and state law. *See Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir. 1983) ("In fashioning federal rules, guidance is gained from general principles for interpreting contracts."); *but see Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1083 (C.D. Cal. 2017) (noting extrinsic evidence may be used to determine ambiguity under California law). Thus, the Court cites some authorities interpreting nonbinding state law in aid of its decision but will note which law those authorities apply.

[5] Accordingly, the Court does not reach Defendant's argument that the Government should be estopped from denying the validity of the agreement or the Probation Officer's approval. (Immunity Mot. 18–19.) The Diversion Agreement is unambiguous, and the Government's position on its interpretation cannot change its meaning.

1  her signature on the "APPROVED BY" block on the signature page. (Immunity Opp'n
2  9–12.)

3      The text of the agreement is susceptible only to the interpretation of *approval*
4  urged by the Government. Defendant's proffered interpretation, that only the parties
5  needed to approve the Diversion Agreement for the term and diversion period to
6  commence, would result in surplusage or redundancy, as a close reading of the terms
7  *approval* and *execution* demonstrates. *United States v. Medina-Carrasco*, 815 F.3d 457,
8  462 (9th Cir. 2016) (rejecting interpretation that "would render meaningless" a
9  provision in a plea agreement); *see also Iron Branch Assocs., LP v. Hartford Fire Ins.*
10 *Co.*, 559 F. Supp. 3d 368, 378 (D. Del. 2021) (Under Delaware law, "[a] court must not
11 render any part of the contract mere surplusage or render any provision or term
12 'meaningless or illusory.'" (quoting *Est. of Osborn ex rel. Osborn v. Kemp*, 991 A.2d
13 1153, 1159 (Del. 2010))).

14     The Court construes the words *execution* and *approval* consistent with their
15 common meanings, which comfortably fit into the framework of the Diversion
16 Agreement. *See Clark*, 218 F.3d at 1096 ("Following traditional rules of contract
17 interpretation, we must examine the plain language of the term in the context of the
18 document as a whole."); *In re Doe*, 57 F.4th at 675 ("We begin with the most natural
19 reading . . . ."). To execute means "[t]o make (a legal document) valid by signing; to
20 bring (a legal document) into its final, legally enforceable form." *Execute*, *Black's Law*
21 *Dictionary* (11th ed. 2019). To approve means "[t]o give formal sanction to; to confirm
22 authoritatively." *Approve*, *Black's Law Dictionary* (11th ed. 2019). Consistent with
23 these meanings, the Diversion Agreement uses *execution* to refer to manifestations of
24 assent by the parties to the agreement, the United States and Defendant, and the
25 agreement uses *approval* to refer to the formal sanction by the Probation Officer.

26     *Approval* and *approved* together appear in three places in the agreement: the
27 provision defining the agreement's term, (Diversion Agreement § II(1)); the provision
28 defining the diversion period, (*id.* § II(2)); and the signature block designated for the

12

Probation Officer, (*id.* at 9). Outside of definition provisions, the only place the agreement uses the *approve* word stem is in the signature block inviting a formal sanction by the Probation Officer. And obtaining the approval of the Probation Officer makes sense in the context of the agreement, as the parties contemplated as a term of Defendant's performance his subjection to her supervision. (*Id.* § II(10)(a).) In other words, the supervision provision would be nugatory if the Probation Officer refused to supervise Defendant.[6] The definition provisions require an *approval*, and the only place in the agreement to which the Court can look to divine the meaning of *approval* is the signature block for the Probation Officer, compelling an interpretation that ties *approval* to an act by the Probation Officer.

In contrast, the term *execution* appears twice in the Diversion Agreement: in the provision defining the diversion period, (*id.* § II(2)), and in a provision authorizing execution of the agreement in counterparts, (*id.* § II(18)). Consistent with the definition of *execute*, the counterparts provision circumscribes the acts of signing the agreement that might validate it; in other words, the parties agreed that signing the same copy of the agreement would have the same effect as signing different copies. Notably, the provision defining the diversion period uses both *execution* and *approval* together, indicating each has its own meaning: "The twenty-four (24) month period following the *execution* and *approval* of this Agreement shall be known as the 'Diversion Period.'" (*Id.* § II(2) (emphases added).) As Defendant's counsel admitted at the hearing,

---

[6] This observation begs a question regarding another provision, the parties' agreement that the United States District Court for the District of Delaware would play an adjudicative role in any alleged material breach of the agreement by Defendant. (Diversion Agreement § II(14).) The judge overseeing the action in Delaware questioned whether it was appropriate for her to play this role. (Del. Hr'g Tr. 92–104.) The Court is uncertain as to whether the parties understood the Probation Officer also to have a role in approving the breach-adjudication plan in her capacity as an agent of the court. *See* 18 U.S.C. § 3602. But these issues need not be resolved to adjudicate the motion.

Defendant's proffered interpretation would render the phrase "execution and approval" redundant in part. The contrast between sections II(1) and II(2) supports an interpretation that gives each word its own meaning; while "approval" triggers the agreement's term, the diversion period begins only "following the execution and approval" of the agreement.[7]

The only reasonable interpretation of *execution* and *approval* inferable from the text of the agreement that would give the terms unique meanings is that they refer to the actions of different actors: *approval*, to the action by the Probation Officer, and *execution*, to the action by the parties.[8] Defendant's proffered interpretation—that *approval* refers to the assent of the parties—would conflate *execution* and *approval*, erasing the distinction the parties drew between these words.

### b.    *Means of Approval*

Even if the Diversion Agreement required approval by the Probation Officer, Defendant argues in the alternative that the Probation Officer's approval of the agreement might be inferred from her publication of a pretrial diversion report that recommends a 24-month term of pretrial diversion. (Immunity Mot. 16–18; *see* Machala Decl. Ex. 5, ECF No. 25-6.) Defendant's theory of approval of the Diversion Agreement finds no purchase in the text of the agreement. The means by which the Probation Officer might approve the Diversion Agreement are not expressly stated, but

---

[7] *But see infra* note 10.

[8] For the reasons discussed in the following subsection, *execution* cannot reasonably be interpreted to refer to affixing signatures by the parties and the Probation Officer collectively. Since *approval* unambiguously must be obtained by means of signature, an interpretation of *execution* that encompasses signature by the Probation Officer would make the phrase "execution and approval" in section II(2) redundant in part. *See Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1165 (D. Ariz. 2005) (acknowledging "the rule of contract interpretation that disfavors constructions that nullify a contract term or render a term superfluous or redundant").

14

the agreement provides but one reasonable, obvious method of approval: affixation of the Probation Officer's signature on the "APPROVED BY" signature block set aside for her. (Diversion Agreement 9.) The agreement is not reasonably susceptible to an interpretation that the Probation Officer could manifest her approval by issuing a pretrial diversion recommendation consistent with the Diversion Agreement, let alone by any means other than signature on the line reserved for her.[9]

Defendant's theory is also at odds with uncontroverted facts before the Court. In response to Defendant's motion, the Government submitted a declaration from Assistant United States Attorney Benjamin J. Wallace, who testified that on the morning of July 26, 2023, the Probation Officer declined to sign the Diversion Agreement. (*See* Wallace Decl., ECF No. 35-1.) Defendant did not dispute this representation in his reply memorandum, and while Defendant's counsel tried to minimize this testimony at the hearing, his arguments were unpersuasive.

---

[9] Defendant's argument would fail on its merits even if the Probation Officer could have manifested her approval by issuing a pretrial diversion report. Defendant submits that the Probation Officer provided a "letter to counsel . . . enclosing her recommendation in favor of the Diversion Agreement and copy of the Agreement." (Immunity Mot. 18.) The report filed with this Court does not reference or attach a copy of the agreement at all. (*See generally* Machala Decl. Ex. 5.) That said, the report filed with the motion is incomplete and apparently redacted. Although some of the recommended conditions of pretrial diversion align with the conditions discussed in the Diversion Agreement, they do not mirror each other perfectly. (*See, e.g.*, Machala Decl. Ex. 5 § 38(5) (requiring as a condition of pretrial diversion Defendant's consent to entry into a criminal background check system, a condition not discussed in the Diversion Agreement).) Further, another document in the motion record indicates that the parties modified the Diversion Agreement after the Probation Officer issued her report in an effort to "more closely match" the report. (Clark Decl. Ex. T (providing July 20, 2023 revisions to Diversion Agreement); *cf.* Machala Decl. Ex. 5 (dated July 19, 2023).) The Court resists Defendant's ouroboric theory that the Probation Officer manifested approval of an agreement the parties changed in response to the purported approval. Further, the Court doubts the Probation Officer manifested approval of the revised version of the Diversion Agreement passively by being party to an email circulating the updated draft. (*See* Clark Decl. Ex. T.)

c. *Condition of Approval*

The Government argues that the Probation Officer's signing of the Diversion Agreement was a condition precedent to its formation. (Immunity Opp'n 12–18.) The Diversion Agreement is not reasonably susceptible to the Government's interpretation; the text of the agreement unambiguously makes *approval* a condition precedent to performance, not to formation.

As discussed, *approval* helps define the temporal scope of two terms: the agreement's term and the diversion period. (Diversion Agreement §§ II(1)–(2).) Approval is a predicate to the commencement of both periods. The parties expressly tied performance of several obligations under the Diversion Agreement to the diversion period. (*E.g.*, *id.* § II(10) (setting forth Defendant's obligations "during the Diversion Period").) Although the parties did not expressly tie their obligations to the agreement's term, the survival clause indicates that the parties contemplated performance only during the contract term except where expressly provided. (*Id.* § II(1).)[10] In other words, the parties made performance of contractual obligations conditional upon *approval*.

The provisions pertaining to formation of the agreement stand in contrast to the terms requiring *approval*. The agreement clearly identifies the United States and Defendant—not the Probation Officer—as parties to the agreement. (*Id.* §§ I, II(19).) The agreement contemplates *execution* of the agreement in counterparts—and, as discussed, *execution* requires the parties' signature, not the Probation Officer's. (*Id.*

---

[10] The Diversion Agreement contains no express provisions invoking the survival clause as it relates to the agreement's term, but the parties provided that certain provisions would survive the diversion period. (Diversion Agreement § II(4) (requiring performance "within thirty (30) days after the expiration of the Diversion Period"); *id.* § II(9)(a) (requiring performance "during the Diversion Period or at any time thereafter").) This might support a reading that the agreement's term is synonymous with the diversion period, though that reading would sanction a redundancy. But the Court need not conclusively interpret these provisions to render an interpretation of *approval* as a condition precedent to performance.

1 § II(18).) The Probation Officer's sanction is not required for the parties to modify the

2 agreement. (*Id.* § II(19).) *Approval* has no bearing on any of these provisions pertinent

3 to formation and modification of the agreement.

4       The Government offers no persuasive argument that procuring the Probation

5 Officer's signature was a condition precedent to the agreement's formation as opposed

6 to its performance. Indeed, the authority that opens the Government's argument to this

7 end teaches that "formation-contingent language" should "jump[] out at you." *Int'l Bhd.*

8 *of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1046 (9th Cir. 2020) (internal

9 quotation marks omitted) (construing California law); (*see* Immunity Opp'n 12–13

10 (quoting *Int'l Bhd. of Teamsters*, 957 F.3d at 1043)); *see also United States v. Murray*,

11 897 F.3d 298, 306 (D.C. Cir. 2018) (Garland, C.J.) ("While specific, talismanic words

12 are not required, the law nevertheless demands that conditions precedent be expressed

13 in unmistakable language." (internal quotation marks omitted)).

14       At the hearing, the Government offered *United States v. Gonzalez*, 918 F.2d 1129

15 (3d Cir. 1990), in support of its argument that the Probation Officer's approval was a

16 condition precedent to formation. There, the government offered a package plea

17 agreement to three criminal codefendants, one of whom refused, resulting in the

18 government's withdrawal of the deal. *Id.* at 1131–32. One of the defendants who

19 accepted the plea claimed the agreement should be enforced as it applied to him. *Id.* at

20 1131–33. Observing that the parties did not dispute that unanimous acceptance by all

21 three men was a condition precedent to the agreement's formation, the district court and

22 the circuit panel refused to enforce the deal. *Id.* at 1133. This authority does not discuss

23 the distinction between conditions precedent to formation versus conditions precedent

24 to performance, and the existence of a condition precedent to formation was undisputed.

25 Thus, *Gonzalez* has little persuasive value here.

26       Nothing in the text of the Diversion Agreement tethers the very existence of the

27 agreement, or any party's acceptance of the agreement, to the Probation Officer's

28 approval. *See* Restatement (Second) of Contracts § 36(2) ("[A]n offeree's power of

acceptance is terminated by the non-occurrence of any condition of acceptance under the terms of the offer."); *cf. id.* § 224 cmt. c ("In order for an event to be a condition, it must qualify a duty under an existing contract. Events which are part of the process of formation of a contract, such as offer and acceptance, are therefore excluded under the definition [of condition] in this section."). For example, there is no clear indication that the United States' acceptance of the Diversion Agreement was contingent on the Probation Officer's approval, *cf. McKenzie v. Risley*, 801 F.2d 1519, 1527 (9th Cir. 1986) (applying federal law to habeas petition by Montana inmate, and reasoning that the petitioner and the prosecution did not form a plea agreement where "the prosecutors made it clear that they wished to discuss any plea agreement with the victim's family before finally approving it"), *vacated upon grant of reh'g en banc*, 815 F.2d 1323 (9th Cir. 1987), and there is no provision deeming the agreement "not . . . valid unless and until all signatures appear where indicated below," *United States v. Ha*, No. CR07-4068-MWB, 2008 U.S. Dist. LEXIS 29187, at *16–17 (N.D. Iowa Apr. 9, 2008).

Instead, *approval* qualifies the temporal scope of the agreement and, thus, unambiguously presents a condition to performance thereunder. (Diversion Agreement §§ II(1)–(2).) "Generally in contracts, when reference is made to conditions, what is meant are conditions to performance—that is, conditions which become operative after formation of the contract and qualify the duty of immediate performance of a promise or promises in that contract—not conditions to the creation or formation of a contract or promise." 13 Richard A. Lord, *Williston on Contracts* § 38:4 (4th ed. 2023); *see also* Restatement (Second) of Contracts § 224 cmt. c ("In order for an event to be a condition, it must qualify a duty under an existing contract."). On the topic of approval by a third party as a condition, a leading treatise explains:

> In making a contract the parties may use language indicating that the "contract" itself is conditional on some collateral event, such as the approval of a third person, court or commission, or the award of some collateral construction

18

1            contract. In such cases, technically, it is quite incorrect to say

2            that until the event occurs there is no contract; neither party

3            has the privilege of revocation and no further expression of

4            assent by the two parties is necessary.

5  8 Catherine M.A. McCauliff, *Corbin on Contracts* § 31.10 (Joseph M. Perillo ed., 1999)

6  (footnote omitted). Analogously, the Probation Officer did not need to approve the

7  Diversion Agreement for its formation to be perfected, though the parties made their

8  performance of their obligations contingent upon the event of her signing.

9

10               4.    <u>Whether Defendant Has Immunity</u>

11      Having found that the Diversion Agreement is a contract that binds the parties

12  but that the parties made the Probation Officer's signature a condition precedent to its

13  performance, the Court turns to Defendant's theory of immunity: that the United States'

14  obligation to refrain from prosecuting Defendant under section II(15) of the Diversion

15  Agreement is currently in force. (Immunity Mot. 19–20.) It is not. The immunity

16  provision is not one exempted from the term of the contract under the survival clause.

17  (*See* Diversion Agreement §§ II(1), (15).) Thus, performance of the Government's

18  agreement not to prosecute Defendant is not yet due.[11]

19      The Court understands that its decision rests on an interpretation of the agreement

20  neither party advocated—that the Diversion Agreement is a binding contract but

21  performance of its terms is not yet required. The Court, therefore, invites the parties to

22  stipulate to further pretrial motion practice to the extent there are additional disputes

23

24

25  _____

26  [11] Similarly, Defendant is not yet obliged to avoid contradicting the statement of facts,

27  (Diversion Agreement § II(12)), which he did in his motions to dismiss, (*compare id.* Attach. A ("Biden moved to California in the spring of 2018 . . . ."), *with* Venue Mot.

28  2, ECF No. 32 ("Mr. Biden moved to California in the summer of 2019 . . . .")).

that arise from the Court's Schrödinger's cat-esque construction of Defendant's immunity under the Diversion Agreement.[12]

## C.  Conclusion

The motion is denied.

## III.  MOTION TO DISMISS THE INDICTMENT BECAUSE SPECIAL COUNSEL WEISS WAS UNLAWFULLY APPOINTED AND THE PROSECUTION VIOLATES THE APPROPRIATIONS CLAUSE (ECF NO. 26)

Defendant argues that the Court should dismiss the indictment because the Government unlawfully appointed Special Counsel David Weiss and, alternatively, because the Department of Justice's ("DOJ") funding of Mr. Weiss in his role as Special Counsel violates the Appropriations Clause. (*See generally* Appointment Mot., ECF No. 26.) The Government contends that both Mr. Weiss's appointment as Special Counsel and funding as Special Counsel are lawful. (*See generally* Appointment Opp'n, ECF No. 36.)

### A.  Background

Mr. Weiss began investigating this matter in 2019 while acting as the United States Attorney for the District of Delaware. *See* Att'y Gen. Order No. 5730-2023 (Aug. 11, 2023), https://www.justice.gov/d9/2023-08/order.appointment_of_david_c._weiss _as_special_counsel.pdf [https://perma.cc/LY96-QUZJ]. On August 11, 2023, Attorney General Merrick Garland appointed Mr. Weiss Special Counsel to continue

---

[12] The Court expressly closes the door to further pretrial motion practice on any other issues. (*See* Mins., ECF No. 17.) Further, the Court will not allow any such motion to delay the pretrial status conference set for May 29, 2024.

the investigation pursuant to 28 U.S.C. §§ 509, 510, 515, and 533, and decided to make Mr. Weiss's appointment subject to 28 C.F.R. §§ 600.4–.10. *See Attorney General Merrick B. Garland Delivers a Statement*, Office of Public Affairs, U.S. Dep't of Justice (Aug. 11, 2023), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-statement [https://perma.cc/MX8D-SYL5].[13] Mr. Weiss continues to serve as United States Attorney for the District of Delaware. *Id.* The DOJ is funding Mr. Weiss's work under a permanent, indefinite appropriation for expenses by independent counsels. (Appointment Mot. 6.)[14]

### B.   Appointment of Special Counsel

#### 1.   Legal Standard

Federal statutes govern who may litigate cases on behalf of the United States. "All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," save some exceptions irrelevant here. 28 U.S.C. § 509. The Attorney General may delegate those functions to "any other officer, employee, or agency of the Department of Justice" as the Attorney General "considers appropriate." *Id.* § 510. And "any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings . . . which United States attorneys are authorized by law to conduct." *Id.* § 515(a); *see also id.* § 533 ("The Attorney

---

[13] The Court, on its own motion, takes judicial notice of these materials from the website of the DOJ.

[14] Defendant offers no support for this proposition, but his proffer appears consistent with statements made in a publication by the DOJ. U.S. Dep't of Justice, *Special Counsel's Office – Weiss Statement of Expenditures August 11, 2023 through September 30, 2023*, at 4, https://www.justice.gov/d9/2024-01/SCO%20David%20C.%20Weiss%20-%20SOE%20-%20Aug%2011%202023%20to%20Sept%2030%20202023_final%201.5.2024.pdf [https://perma.cc/D9PT-CMU4].

General may appoint officials . . . to detect and prosecute crimes against the United States . . . [and] to conduct such other investigations regarding official matters under the control of the Department of Justice . . . .").

The DOJ has promulgated a set of regulations regarding the appointment and supervision of "Special Counsel." General Powers of Special Counsel, 28 C.F.R. Part 600.[15] The regulations provide that the Attorney General may appoint a Special Counsel if the Attorney General "determines that criminal investigation of a person or matter is warranted" and assigning a United States Attorney or other DOJ lawyer "would present a conflict of interest for the Department or other extraordinary circumstances." 28 C.F.R. § 600.1. A Special Counsel named pursuant to the regulations "shall be selected from outside the United States Government." *Id.* § 600.3(a). The regulations also provide that the Attorney General sets the scope of a Special Counsel's jurisdiction. 28 C.F.R. § 600.4. Once the Attorney General sets a Special Counsel's jurisdiction, the Special Counsel has the authority to "exercise all investigative and prosecutorial functions of any United States Attorney." *Id.* § 600.6. A Special Counsel must "comply with the rules, regulations, procedures, practices and policies of the Department of Justice" and "consult with appropriate offices within the Department for guidance with respect to established practices, policies and procedures," or with the Attorney General if the Special Counsel concludes that "extraordinary circumstances of any particular decision" would make such consultation "inappropriate." *Id.* § 600.7(a).

The Attorney General's responsibility over a Special Counsel includes the power to discipline or remove the Special Counsel. *Id.* § 600.7(d). That said, a Special Counsel is not "subject to the day-to-day supervision of any official of the Department," though the Attorney General may request that the Special Counsel explain any investigative or

---

[15] For an in-depth history of the Special Counsel regulations and related law, see *United States v. Manafort*, 312 F. Supp. 3d 60, 69–70 (D.D.C. 2018), and *United States v. Stone*, 394 F. Supp. 3d 1, 17–19 (D.D.C. 2019).

1  prosecutorial step and may conclude that the step "is so inappropriate or unwarranted
2  under established Departmental practices that it should not be pursued." *Id.* § 600.7(b).
3  "If the Attorney General concludes that a proposed action . . . should not be pursued,
4  the Attorney General" must notify the Chairs and Ranking Minority Members of the
5  Judiciary Committees of the House of Representatives and Senate. *Id.* §§ 600.7(b),
6  600.9(a). The Attorney General must also notify the Chairs and Ranking Minority
7  Members upon removing a Special Counsel. *Id.* § 600.9(a)(2).

8

9                            2.    <u>Discussion</u>

10         Defendant argues that the DOJ regulations require that a Special Counsel be
11  appointed from outside of the government and, thus, Mr. Weiss is not eligible to serve
12  as a Special Counsel because he served and continues to serve as United States Attorney
13  for the District of Delaware. (Appointment Mot. 2–6; Appointment Reply 1–3.) In
14  response, the Government argues that appointment of a Special Counsel pursuant to 28
15  C.F.R. §§ 600.1–.10 is only one mechanism in place for the Attorney General to appoint
16  an independent counsel, and that the Attorney General's statutory authority under 28
17  U.S.C. §§ 509, 510, 515, and 533 provide the Attorney General with sufficient authority
18  to appoint an independent counsel without all of the requirements of 28 C.F.R.
19  §§ 600.1–.10. For the reasons discussed below, the Court agrees with the Government's
20  positions.

21         Title 28 clearly vests the Attorney General with the functions of the DOJ, 28
22  U.S.C § 509, and permits the Attorney General to delegate those functions to any other
23  officer of the DOJ, 28 U.S.C. § 510; *see also id.* §§ 515, 533; *United States v. Nixon*,
24  418 U.S. 683, 694 (1974).

25         Defendant offers no convincing reason why the Special Counsel regulations
26  displace the Attorney General's statutory authority as opposed to merely existing in
27  parallel with that authority. Defendant argues that the Part 600 regulations retained a
28  requirement from the now-lapsed Ethics in Government Act the regulations replaced,

which required a special prosecutor to not "hold[] or recently [hold] any office of profit or trust under the United States." Pub. L. No. 95-521, 92 Stat. 1824 (1978); (*see* Appointment Mot. 2–4). But Defendant ignores that the Attorney General's statutory authority under §§ 509, 510, and 515, and the lapsed law always coexisted in parallel. *See In re Sealed Case*, 829 F.2d 50, 52–53, 55–58 (D.C. Cir. 1987); *United States v. Libby*, 429 F. Supp. 2d 27, 34 (D.D.C. 2006).

At the hearing on his motion, Defendant argued that, as implementing regulations, the Attorney General could not sidestep the Part 600 regulations when appointing independent counsel. Again, the Court disagrees.

"Agency regulations fall into two distinct categories: 'substantive rules on the one hand and interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice on the other.'" *United States v. Manafort*, 312 F. Supp. 3d 60, 75 (D.D.C. 2018) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 & n.30 (1979)). A substantive, or "legislative-type," rule "affect[s] individual rights and obligations" and "may be 'binding' or have the 'force of law.'" *Chrysler Corp.*, 441 U.S. at 302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235–36 (1974)). Such rules are promulgated "in compliance with procedures imposed by Congress, such as requirements for notice and comment set forth in the Administrative Procedure Act." *Manafort*, 312 F. Supp. 3d at 75 (citing *Chrysler Corp.*, 441 U.S. at 303).

The DOJ was unambiguously clear that it was not creating a substantive rule in promulgating the Part 600 regulations. The regulations concern "matters of agency management or personnel" and "agency organization, procedure, or practice." Final Rule, 64 Fed. Reg. 37038, 37041 (July 9, 1999) (citing 5 U.S.C. §§ 552–53). Further, the DOJ did not subject the regulations to the rulemaking procedures required by the Administrative Procedure Act, such as notice and comment. *Id.* And the DOJ promulgated the regulations pursuant to 5 U.S.C. § 301, which allows the head of an executive department to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the

24

custody, use, and preservation of its records, papers, and property."[16] Finally, § 600.10 explicitly states that the regulations are "not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or equity." 28 C.F.R. § 600.10. "Courts have held that the type of language used in section 600.10 is effective to disclaim the creation of any enforceable rights." *Manafort*, 312 F. Supp. 3d at 76 (collecting cases).[17]

Nor is Defendant's citation of *Nixon*, 418 U.S. 683, convincing. There, the Supreme Court held that the regulation appointing the Watergate Special Prosecutor, including giving the Special Prosecutor "explicit power" to challenge any assertion of executive privilege, had the "force of law." *Id.* at 694–95. The facts and law here are distinguishable. For one, *Nixon* dealt with an internal executive branch struggle, not a criminal defendant's attempt to enforce DOJ compliance with a regulation. *See id.* at 697. Further, in holding that the Watergate regulations had the force of law, the Supreme Court noted that "the delegation of authority to the Special Prosecutor . . . is not an ordinary delegation by the Attorney General to a subordinate officer" because the removal of the Special Prosecutor required the consensus of eight designated members of Congress. *Id.* at 696. Those circumstances are not present in this case.

Defendant concedes in his reply that §§ 509, 510, 515, and 533 "may authorize the AG to appoint a prosecutor" but argues that a "Special Counsel" is a "term of art created by DOJ regulations." (Appointment Reply 2.) This argument clearly places

---

[16] The Supreme Court has called U.S.C. § 301 a "housekeeping statute." *Chrysler Corp.*, 441 U.S. at 309.

[17] The Court also notes that the regulations do not purport to be the exclusive avenue for the Attorney General to appoint a Special Counsel, and they appear to support the contrary position given that the regulations are cabined to the need for an "*outside* Special Counsel." 28 C.F.R. § 600.1(b). To determine, then, that all Special Counsel must be appointed from without the government would render the word "outside" surplusage. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (Courts "are . . . reluctant to treat statutory terms as surplusage in any setting." (cleaned up)).

form over substance. Following Defendant's logic, the Attorney General could have appointed Mr. Weiss "Designated Counsel" pursuant to the Attorney General's statutory authority and 28 C.F.R. §§ 600.4–.10, and the issue Defendant complains of would disappear. That the Attorney General used the term "Special Counsel" instead of some other term similarly indicative of an independent counsel is a distinction without a difference.

### C.    Appropriations Clause

#### 1.    Legal Standard

A defendant may seek to enjoin a prosecution funded in violation of the Appropriations Clause. *See United States v. Pisarski*, 965 F.3d 738, 741 (9th Cir. 2020); *United States v. Evans*, 929 F.3d 1073, 1076 (9th Cir. 2019); *United States v. McIntosh*, 833 F.3d 1163, 1173–74 (9th Cir. 2016). Under the Appropriations Clause of the Constitution, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (internal quotation marks omitted); *see* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Richmond*, 496 U.S. at 424.

#### 2.    Discussion

Defendant argues that the DOJ's funding of this prosecution violates the Appropriations Clause and, thus, the Court should dismiss the indictment. (Appointment Mot. 6–8.) Defendant asserts, and the Government does not dispute, that the DOJ is funding this prosecution through an appropriation for independent counsel. *See* 28 U.S.C. § 591 note ("[A] permanent indefinite appropriation is established within the Department of Justice to pay all necessary expenses of investigations and

prosecutions by independent counsel appointed pursuant to the provisions of [the now-lapsed Ethics in Government Act] or other law.").

Defendant contended at the hearing that the indefinite appropriation incorporated the now-lapsed Ethics in Government Act's definition of "independent," and thus is unavailable to fund Mr. Weiss. The Court rejects this argument for several reasons. First, the Ethics in Government Act at no point explicitly defined the term "independent" or "independent counsel." *See* 28 U.S.C. §§ 591–99. Further, while Congress passed the appropriation with the Ethics in Government Act in mind, the plain language of the appropriation unambiguously refers to independent counsel appointed pursuant to other statutory authority. *See* Pub. L. No. 100-202, tit. II, 101 Stat. 1329 (1987) ("A permanent indefinite appropriation is established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of [the now-lapsed Ethics in Government Act] *or other law*." (emphasis added)). In fact, in the text of the provision, Congress specifically differentiated between "Independent Counsel" appointed pursuant to the Ethics in Government Act and other "independent counsel":

> *Provided further*, That of the funds appropriated to the Department of Justice in this Act, not to exceed $1,000,000 may be transferred to this appropriation to pay expenses related to the activities of any *Independent Counsel* appointed pursuant to 28 U.S.C. 591, et seq. . . . . *Provided further*, That a permanent indefinite appropriation is established within the Department of Justice to pay all necessary expenses of investigations and prosecution by *independent counsel* . . . .

*Id.* (emphasis added). "The separate references to 'Independent Counsel' (capitalized) and 'independent counsel' (lower case) within the same provision show that Congress recognized a distinction between the specific 'Independent Counsel appointed pursuant to 28 U.S.C. 591' and a general category of independent counsel to be appointed under

27

1    section 591 or other law." *United States v. Stone*, 394 F. Supp. 3d 1, 20 (D.D.C. 2019)

2    (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

3         Defendant argues that Special Counsel Weiss's appointment pursuant to 28

4    U.S.C. §§ 509, 510, 515, and 533 and 28 C.F.R. §§ 600.4–.10, but not 28 C.F.R.

5    § 600.3, is ineligible for the appropriation because a Special Counsel appointed from

6    within the DOJ could never have an adequate quantum of independence to qualify as

7    an independent counsel within the meaning of the appropriation. (Appointment Mot. 6–

8    8.) The Government disagrees. (Appointment Opp'n 10–14.) To determine whether

9    Special Counsel Weiss, as appointed, is an "independent counsel," the Court must

10   interpret the text of the statute.

11        "The interpretation of a statutory provision must begin with the plain meaning of

12   its language." *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013) (internal

13   quotation marks omitted). "To determine plain meaning, '[courts] examine not only the

14   specific provision at issue, but also the structure of the statute as a whole, including its

15   object and policy.'" *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) (quoting

16   *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999)). "If the

17   language has a plain meaning or is unambiguous, the statutory interpretation inquiry

18   ends there." *Id.* at 833–34 (quoting *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703,

19   706 (9th Cir. 2017)). "[U]nless defined, words in a statute 'will be interpreted as taking

20   their ordinary, contemporary, common meaning.'" *Flores*, 729 F.3d at 914 (quoting

21   *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012)). "In determining the 'plain

22   meaning' of a word, [courts] may consult dictionary definitions, which [courts] trust to

23   capture the common contemporary understandings of the word." *Id.* "If the statutory

24   language lacks a plain meaning, courts may 'employ other tools, such as legislative

25   history, to construe the meaning of ambiguous terms.'" *Lillard*, 935 F.3d at 834 (quoting

26   *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015)).

27        The appropriation does not define the term "independent counsel," providing no

28   guidance to the Court as to what level of independence Congress intended. Nor do

dictionary definitions of the term "independent counsel" clarify the issue. *See, e.g.*, *Counsel*, *Black's Law Dictionary* (11th ed. 2019) (defining "independent counsel" as "[a]n attorney hired to provide an unbiased opinion about a case or to conduct an impartial investigation; esp., an attorney appointed by a governmental branch or agency to investigate alleged misconduct within that branch or agency").

As such, the Court looks to other tools to construe the meaning of the ambiguous term "independent counsel." *Lillard*, 935 F.3d at 834. The parties do not direct the Court to any legislative history documents predating the passage of the appropriation, and the Court is not aware of any. But the General Accounting Office ("GAO")[18] previously audited the appropriation and reported to Congress that other independent counsels appointed after the Ethics in Government Act expired have been paid with funds from the permanent appropriation. *See, e.g.*, U.S. Gen. Acct. Off., GAO/AIMD-00-310, Financial Audit: Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2000, at 5–6 (2000) (reporting to Congress after the lapse of the Ethics in Government Act that "the Department of Justice determined that the appropriation established by Public Law 100-202 to fund expenditures by independent counsels appointed pursuant to 28 U.S.C. 591–599, or other law, is available to fund the expenditures of John C. Danforth, who was appointed as a Special Counsel within the Department of Justice by the Attorney General"), https://www.gao.gov/assets/aimd-00-310.pdf [https://perma.cc/3W9P-UVG7]; U.S. Gov't Accountability Off., GAO-04-1014, Financial Audit: Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2004, at 3–4 (2004) (reporting the same for Special Counsel Patrick J. Fitzgerald, who served contemporaneously as United States Attorney for the

---

[18] The General Accounting Office has been renamed the Government Accountability Office. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 287 n.6 (2010).

Northern District of Illinois), https://www.gao.gov/assets/gao-04-1014.pdf [https://perma.cc/U89J-HAGB].

In fact, after its September 2004 audit, the GAO agreed with the DOJ "that the same statutory authorities that authorize the Attorney General . . . to delegate authority to a U.S. Attorney to investigate and prosecute high ranking government officials are 'other law' for the purposes of authorizing the Department to finance the investigation and prosecution from the permanent indefinite appropriation." U.S. Gov't Accountability Off., B-302582, Special Counsel and Permanent Indefinite Appropriation 7 (2004), https://www.gao.gov/assets/b-302582.pdf [https://perma.cc/6VAD-UBJ8] ("GAO Analysis"). After this report, the only change Congress made to the appropriation was to remove the GAO's audit duty. *See* Pub. L. No. 111-68, § 1501(d), 123 Stat. 2023, 2041 (2009). This suggests that the DOJ's use of the appropriation to fund independent counsels appointed from within the DOJ is consistent with Congress's intent. *See United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) ("[O]nce an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." (internal quotation marks omitted)).

Defendant argues in his reply that the GAO Analysis and *Stone* cut against the Government's opinion because the GAO Analysis examined Special Counsel Fitzgerald, who was not subject to the Part 600 regulations, and *Stone* concerned Special Counsel Robert Mueller, who was appointed from outside the government. (Appointment Reply 7–9.) The Court is not convinced.

As noted above, Special Counsel Weiss was lawfully appointed from within the Government pursuant to 28 U.S.C. §§ 509, 510, 515, and 533. And while the GAO Analysis, which is not binding on the Court, does note that the "indicia of independence of Special Counsel Fitzgerald" included his "express exclusion . . . from the application of 28 C.F.R. Part 600," and the Attorney General's delegation of all his authority with

respect to the Special Counsel Fitzgerald's investigation, GAO Analysis 6, this does not mean that Mr. Weiss lacks sufficient independence.

Though Mr. Weiss is subject to some supervision by the Attorney General, *see* 28 C.F.R. § 600.7(b), he operates largely outside of the regular Department of Justice structure and hierarchy. Mr. Weiss is not subject to day-to-day supervision by Department officials. *Id.* He has "the full power and independent authority" of a United States Attorney and determines "whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of [his] duties and responsibilities," save for some exceptions in the Special Counsel regulations. *Id.* § 600.6. While "the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step," the Attorney General must give the Special Counsel's views "great weight." *Id.* § 600.7(b). And if the Attorney General determines that a step should be undone or the Special Counsel removed, the Attorney General must notify Congress. *Id.* And as the DOJ recognized, the Part 600 regulations attempt to "strike a balance between independence and accountability." 64 Fed. Reg. at 37038. Thus, the Part 600 regulations do not indicate that a prosecutor acting subject to the regulations is so restricted that the prosecutor cannot fall within the broad category of "independent counsel" Congress intended to fund. *See Stone*, 394 F. Supp. 3d at 22.[19]

---

[19] Nor is Defendant's reference to a 2002 Congressional Research Service report on the difference between Special Counsel, Independent Counsel, and Special Prosecutors persuasive. (*See* Appointment Reply 9 n.5); Jack Maskell, Cong. Rsch. Serv., RL31246, Independent Counsel Law Expiration and the Appointment of "Special Counsels" (2002). While it is true that the report states the designation "Special Counsel" "seems appropriate . . . since their designation as 'independent' counsels might be considered somewhat of a misnomer," the report, which does not analyze the appropriation, recognized that Special Counsels retained some "limited independence from the Attorney General and the Department of Justice." Maskell, *supra*, at 4.

For these reasons, the Court concludes that Special Counsel Weiss is lawfully funded through the indefinite appropriation, and the Appropriations Clause has not been violated.

### D. Conclusion

The motion is denied.

## IV. MOTION TO DISMISS THE INDICTMENT FOR SELECTIVE AND VINDICTIVE PROSECUTION AND BREACH OF SEPARATION OF POWERS (ECF NO. 27)

Defendant argues that the Court should dismiss the indictment because the prosecution is motivated by discriminatory intent and animus concerning Defendant's political and familial affiliations—particularly his relation to his father, the sitting President of the United States. (Selective Prosecution Mot. 11–15, ECF No. 27.) Defendant contends that the Court should presume vindictiveness because the prosecution made decisions to bring or increase the gravity of charges without intervening events or new evidence. (*Id.* at 15–17.) And Defendant submits that similarly situated individuals are not similarly prosecuted for the crimes for which he is charged. (*Id.* at 17–19.) Defendant requests discovery and a hearing to seek further support for his claims. (*Id.* at 20.) Finally, Defendant contends that the prosecution violates principles of separation of powers. (*Id.* at 19.)

The Government argues that Defendant has not identified a similarly situated person who was not prosecuted, a necessary element of a selective prosecution challenge. (Selective Prosecution Opp'n 8–9, ECF No. 37.) The Government submits there is no evidence of discriminatory animus by prosecutors. (*Id.* at 10–16.) It contends that a presumption of vindictiveness does not apply, and, therefore, the Government need not proffer reasons for its prosecutorial decision-making. (*Id.* at 16–19.) The

Government calls Defendant's separation of powers argument frivolous, and his request for discovery and a hearing unfounded. (*Id.* at 19–20.)[20]

### A. Background

As the Court stated at the hearing, Defendant filed his motion without any evidence. The motion is remarkable in that it fails to include a single declaration, exhibit, or request for judicial notice. Instead, Defendant cites portions of various Internet news sources, social media posts, and legal blogs. These citations, however, are not evidence. To that end, the Court may deny the motion without further discussion. *See* Fed. R. Crim. P. 47(b) (allowing evidentiary support for motions by accompanying affidavit); *see also* C.D. Cal. R. 7-5(b) (requiring "[t]he evidence upon which the moving party will rely in support of the motion" to be filed with the moving papers); C.D. Cal. Crim. R. 57-1 (applying local civil rules by analogy); *cf.* C.D. Cal. Crim. R. 12-1.1 (requiring a declaration to accompany a motion to suppress).

In light of the gravity of the issues raised by Defendant's motion, however, the Court has taken on the task of reviewing all the cited Internet materials so that the Court can decide the motion without unduly prejudicing Defendant due to his procedural error.[21] The facts set out below come from Defendant's sources. While the materials, even if authenticated, contain multiple levels of hearsay, the Court includes them to provide a complete picture of Defendant's argument.

---

[20] The parties freely refer to briefs they filed in connection with a motion to dismiss filed in the criminal case against Defendant pending in Delaware, in which the parties advanced similar arguments, but more voluminously. Although the Court has read the Delaware briefing, (*see* Tr. 13, ECF No. 18), its resolution of the motion rests only on the arguments and evidence presented in the filings in this case. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

[21] However, Defendant mischaracterizes the content of several cited sources. The Court notes discrepancies where appropriate.

Defendant claims that federal prosecutors began investigating his tax affairs in 2018. Kathryn Watson et al., *Investigation into Hunter Biden's "tax affairs" began in 2018*, CBS News (Dec. 10, 2020, 7:01 a.m.), https://www.cbsnews.com/news/hunter-biden-tax-investigation-began-2018/ [https://perma.cc/K4EW-S8F4].[22] According to Defendant, the Department of Justice obtained warrants in 2019 to search his electronic devices for evidence related to his taxes. (Selective Prosecution Mot. 4.)[23] During a presidential debate in 2020, then-President Donald Trump referred to Defendant's drug abuse. Michael Collins, *Hunter Biden's drug use back in public eye as criminal charges could be around the corner*, USA Today (June 12, 2023, 5:02 a.m.), https://www.usatoday.com/story/news/politics/2023/06/12/hunter-biden-addiction-american-families-opioid/70222851007/ [https://perma.cc/VYE3-KBJ4].[24] In late 2020, Mr. Trump reportedly "urged the nation's top law enforcement official to

---

[22] Defendant did not provide a direct link to this source (and numerous others). (Selective Prosecution Mot. 4 n.7.) The Court assumes the article cited in this Order is the one to which Defendant refers even though the date does not match the one presented in Defendant's brief. This article provides no support for Defendant's allegation that then-President Donald Trump called on then-Attorney General William Barr to investigate Defendant in 2018, or that Mr. Barr "secretly assigned U.S. Attorney David Weiss to investigate [him]." (*Id.* at 4.)

[23] Defendant offers no support for this proffered fact. Defendant also asserts that the Department of Justice "determined no felony charges were warranted" upon initial review of the devices seized pursuant to these warrants, but the record is devoid of any evidence indicating that the Department of Justice made any prosecutorial decision at that time. (Selective Prosecution Mot. 4.)

[24] In the Court's reading, nothing in this article stands for the proposition for which Defendant cites it: "While DOJ continued to weather increasing political pressure, Mr. Trump and his supporters used Mr. Biden's personal history as both a means of demeaning the Bidens and leveraging DOJ." (Selective Prosecution Mot. 4.) The article mentions that "Republicans have repeatedly sought to use the federal investigation into Hunter Biden's private affairs . . . as part of their campaign to portray the Biden family as corrupt." Collins, *supra*. Nothing in the article suggests these acts were directed to the Department of Justice as opposed to the electorate at large in the 2020 federal election season.

aggressively investigate [Defendant], . . . saying: 'You figure out what to do w/ H. Biden—people will criticize the DOJ if he's not investigated for real.'" Devlin Barrett & Josh Dawsey, *Trump to acting AG, according to aide's notes: 'Just say the election was corrupt + leave the rest to me,'* Wash. Post (July 31, 2021, 8:09 p.m.), https://www.washingtonpost.com/national-security/trump-rosen-phone-call-notes/2021/07/30/2e9430d6-f14d-11eb-81d2-ffae0f931b8f_story.html [https://perma.cc/8E2E-2TT7]. Defendant publicly announced that he learned about the investigation in December 2020. Watson et al., *supra*.

Defendant's father was elected President of the United States in 2020 and was inaugurated in early 2021. Fed. R. Evid. 201(b)(1). In July 2021, and again in March 2022, Defendant assented to agreements tolling the statute of limitations for violations of various tax laws, including those the Government ultimately charged Defendant of violating in this action. (Selective Prosecution Opp'n Exs. 1–2, ECF Nos. 37-1 to -2.)[25] According to Defendant, "[b]etween January 2022 and May 2023, Mr. Biden discussed the alleged tax violations with DOJ . . . ." (Selective Prosecution Mot. 5.) On May 15, 2023, prosecutors proposed "a non-charge disposition to resolve any and all investigations by the DOJ of Mr. Biden." (Clark Decl. ¶ 6.)[26] After further discussions over the following month, Defendant and the Government coalesced around a deal involving a deferred prosecution agreement and a plea to misdemeanor tax charges. (*See generally id.* ¶¶ 7–39.)

Meanwhile, in late May, Internal Revenue Service agents spoke to news media and testified before the Ways and Means Committee of the United States House of Representatives about their involvement in the tax investigation of Defendant. *E.g.*, Jim Axelrod et al., *IRS whistleblower speaks: DOJ "slow walked" tax probe said to involve*

---

[25] No declaration establishes the authenticity of these documents, but the Court assumes they are true and correct copies of the tolling agreements.

[26] Nothing in this declaration stands for the proposition that "DOJ had already determined that charges should not be brought." (Selective Prosecution Mot. 5.)

*Hunter Biden*, CBS News (May 24, 2023, 8:31 p.m.), https://www.cbsnews.com/news/irs-whistleblower-tax-probe-hunter-biden/ [https://perma.cc/7GQF-2HJA]; Michael S. Schmidt et al., *Inside the Collapse of Hunter Biden's Plea Deal*, N.Y. Times (Aug. 19, 2023), https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-deal.html [https://perma.cc/6CVJ-KYDK].[27]

        The putative plea deal became public in June 2023. Several members of the United States Congress publicly expressed their disapproval on social media. The Republican National Committee stated, "It is clear that Joe Biden's Department of Justice is offering Hunter Biden a sweetheart deal." Mr. Trump wrote on his social media platform, "The corrupt Biden DOJ just cleared up hundreds of years of criminal liability by giving Hunter Biden a mere 'traffic ticket.'" Phillip M. Bailey, *'Slap on the wrist': Donald Trump, congressional Republicans call out Hunter Biden plea deal*, USA Today (June 20, 2023, 11:17 a.m.), https://www.usatoday.com/story/news/politics/2023/06/20/donald-trump-republicans-react-hunter-biden-plea-deal/70337635007/ [https://perma.cc/TSN9-UHLH].[28] On June 23, 2023, the Ways and

_____

[27] Defendant asserts that the IRS agents' actions prompted then-United States Attorney David Weiss to change his position away from a non-charge disposition to the plea the parties ultimately contemplated, (Selective Prosecution Mot. 5 & nn.11–12), but the support for this assertion apparently is his own attorneys' and the IRS agents' speculation as reported by the *New York Times*, *see* Schmidt et al., *supra* ("Mr. Biden's legal team agrees that the I.R.S. agents affected the deal . . . ."). For the same story, Mr. Weiss declined to comment, and an unnamed law enforcement official disputed the assertion. *Id.*

[28] This source does not stand for the proposition that "extremist Republicans were . . . using the excuse to interfere with the investigation." (Selective Prosecution Mot. 5–6.) Of Mr. Weiss, Mr. Trump also wrote: "He gave out a traffic ticket instead of a death sentence. . . . Maybe the judge presiding will have the courage and intellect to break up this cesspool of crime. The collusion and corruption is beyond description. TWO TIERS OF JUSTICE!" Ryan Bort, *Trump Blasts Prosecutor He Appointed for Not Giving Hunter Biden 'Death Sentence,'* Rolling Stone (July 11, 2023), https://www.rollingstone.com/politics/politics-news/trump-suggests-hunter-biden-death-penalty-1234786435/ [https://perma.cc/UH6N-838R].

Means Committee of the United States House of Representatives voted to publicly disclose congressional testimony from the IRS agents who worked on the tax investigation. Jason Smith, chair of the Ways and Means Committee, told reporters that the agents were "[w]histleblowers [who] describe how the Biden Justice Department intervened and overstepped in a campaign to protect the son of Joe Biden by delaying, divulging and denying an ongoing investigation into Hunter Biden's alleged tax crimes." Farnoush Amiri, *GOP releases testimony alleging DOJ interference in Hunter Biden tax case*, PBS NewsHour (June 23, 2023, 3:58 p.m.), https://www.pbs.org/newshour/politics/gop-releases-testimony-alleging-doj-interference-in-hunter-biden-tax-case.[29] One day before the plea hearing in the United States District Court for the District of Delaware, Mr. Smith moved to file an amicus curiae brief imploring the court to consider the IRS agents' testimony and related materials in accepting or rejecting the plea agreement. Mem. of Law in Support of Mot. for Leave to File Amicus Curiae Br., *United States v. Biden*, No. 1:23-mj-00274-MN (D. Del. July 25, 2023), ECF No. 7-2; Amicus Curiae Br., *United States v. Biden*, No. 1:23-mj-00274-MN (D. Del. July 25, 2023), ECF No. 7-3.[30]

On July 26, 2023, the district judge in Delaware deferred accepting Defendant's plea so the parties could resolve concerns raised at the plea hearing. (*See generally* Del. Hr'g Tr. 108–09.) That afternoon, Defendant's counsel presented Government counsel a menu of options to address the concerns. (Def.'s Suppl. Ex. C, ECF No. 58-1.)[31] On July 31, Defendant's counsel and members of the prosecution team held a telephone conference in which they discussed revising the Diversion Agreement and Plea

---

[29] This source does not stand for the proposition that several leaders of house committees "opened a joint investigation." (Selective Prosecution Mot. 6.)

[30] The docket does not show that the Delaware district court resolved the motion, and the Court is uncertain whether the court considered Mr. Smith's brief.

[31] No declaration establishes the authenticity of this document, but the Court assumes it is a true and correct copy of counsel's correspondence.

Agreement. The Government proposed amendments and deletions. (*See* Lowell Decl. Ex. B, ECF No. 48-3.) On August 7, counsel for Defendant responded in writing to these proposals, signaling agreement to certain modifications but resisting the Government's proposal to modify the provision of the Diversion Agreement contemplating court adjudication of any alleged breaches and to delete the provision conferring immunity to Defendant. Defense counsel took the position that the parties were bound to the Diversion Agreement. (*Id.*) On August 9, the Government responded in writing, taking the position that the Diversion Agreement was not in effect, withdrawing its proposed modifications offered on July 31 in addition to the versions of the agreements at play on July 26, and signaling that it would pursue charges. (Def.'s Suppl. Ex. C.) On August 11, United States Attorney General Merrick Garland appointed United States Attorney David Weiss to serve as Special Counsel, Att'y Gen. Order No. 5730-2023 (Aug. 11, 2023), https://www.justice.gov/d9/2023-08/ order.appointment_of_david_c._weiss_as_special_counsel.pdf [https://perma.cc/ LY96-QUZJ], and the Government represented to the Delaware district court that "the parties are at an impasse and are not in agreement on either a plea agreement or a diversion agreement," Mot. to Vacate Ct.'s Briefing Order, *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del. Aug. 11, 2023), ECF No. 25.

Members of Congress commented on these developments. James Comer, chair of the House Committee on Oversight and Accountability, commented on the Delaware district judge's decision not to accept the plea at the July 26 hearing, "I think that you're seeing our investigation that's shined a light on the many wrongdoings of the Biden family has picked up a lot of credibility today, because now we see that there are a lot of crimes that this family's committed and that played out in court today." Kyle Morris et al., *Comer says House investigations into Hunter Biden given a 'lot of credibility' after plea deal crumbles*, Fox News (July 26, 2023, 4:34 p.m.), https:// www.foxnews.com/politics/comer-says-house-investigations-into-hunter-biden-given-lot-

credibility-plea-deal-crumbles [https://perma.cc/TY2T-C794].[32] After the plea hearing, Mr. Smith told Fox News, "I think that justice is being served," *Jason Smith on Hunter Biden plea deal collapse: Justice is being served*, Fox News (July 26, 2023, 7:01 p.m.), https://www.foxnews.com/video/6331889313112 [https://perma.cc/YL3P-JNW5].[33]

---

[32] Again, it is unclear whether congressional investigations played any role in the Delaware district judge's treatment of the case, as Mr. Smith's motion for leave to file an amicus curiae brief presenting information derived from those congressional investigations remains unresolved. *See supra* note 30.

[33] Defendant also quotes an X post in which Mr. Smith asserts that the Special Counsel would not have been appointed but for congressional Republicans' efforts. (Selective Prosecution Mot. 7.) But Defendant quotes the first of a four-post thread *criticizing* the appointment:

> Announcement of a special counsel only happened because congressional GOP exposed the two-tiered judicial system by shining light onto the investigation into Hunter Biden's alleged financial crimes & the political interference that shielded both him & POTUS from scrutiny. Unfortunately, A.G. Garland selected the very same Biden-aligned U.S. Attorney of Delaware, David Weiss, who oversaw the clearly bungled investigation into Hunter Biden and who was the architect of his sweetheart plea deal. This move raises clear concerns that the Administration is once again running cover for the political interference into the Hunter Biden investigation that led to the unprecedented plea deal that fell apart before a federal Judge in Delaware. The reality is this appointment is meant to distract from, and slow down, our investigations. But Congress will not be deterred from continuing its work to hold the Biden Administration accountable and will use every tool available to uncover the facts the American people deserve[.]

Jason Smith (@RepJasonSmith), X (Aug. 11, 2023, 11:19 a.m.) (posts combined), https://x.com/repjasonsmith/status/1690065476838105088 [https://perma.cc/S3YK-ZWYL], https://x.com/repjasonsmith/status/1690065478230691840 [https://perma.cc/8S6L-DSDD], https://x.com/repjasonsmith/status/1690065479593795585 [https://perma.cc/AYV5-75HX], https://x.com/repjasonsmith/status/1690065480940134400 [https://perma.cc/Z5R2-RBHV]. Mr. Comer echoed Mr. Smith's sentiments in a press release issued the same day. *Comer: Justice Department Attempting a Biden Family Coverup*, Comm. on Oversight & Accountability (Aug. 11, 2023),

In October 2023, Martin Estrada, United States Attorney for the Central District of California, and Matthew Graves, United States Attorney for the District of the District of Columbia, told the House Judiciary Committee that they declined to partner with Mr. Weiss to work on charges against Defendant; Mr. Estrada indicated "his office was simply too 'resource-strapped' to assign anyone to the case," whereas Mr. Graves said "it would have been too difficult for his office to 'get up to speed on everything.'" Steven Nelson, *Biden-picked LA US attorney claimed he was too 'resource-strapped' to charge Hunter*, N.Y. Post (Oct. 26, 2023, 6:18 p.m.), https://nypost.com/2023/10/26/news/us-attorney-martin-estrada-says-he-had-no-resources-to-charge-hunter-biden/ [https://perma.cc/UHQ5-82DU]. In a closed-door interview with Judicial Committee investigators in November 2023, Mr. Weiss reportedly acknowledged that "people working on the case have faced significant threats and harassment, and that family members of people in his office have been doxed." Betsy Woodruff Swan, *What Hunter Biden's prosecutor told Congress: Takeaways from closed-door testimony of David*

---

https://oversight.house.gov/release/comer-justice-department-attempting-a-biden-family-coverup/ [https://perma.cc/N3MX-6CBT]. In any event, nowhere do Messrs. Comer and Smith "publicly admit[] they forced DOJ to" renege on the proposed plea deal and pursue felony charges, as Defendant argues. (Selective Prosecution Mot. 6.) Moreover, Defendant appears to suggest that, after the deal in Delaware fell apart but before the filing of the indictment in this case, Mr. Trump "joined the fray, vowing that if DOJ does not prosecute Mr. Biden for more, he will 'appoint a real special prosecutor to go after' the 'Biden crime family,' 'defund DOJ,' and revive an executive order allowing him to fire Executive Branch employees at will." (*Id.* at 7.) The comments he cites all predate the unraveling of the Delaware plea—if not even earlier, before the announcement of a plea. *See* Kristen Holmes, *Trump's radical second-term agenda would wield executive power in unprecedented ways*, CNN Politics (Nov. 16, 2023, 8:41 p.m.) (recounting comments from June 2023), https://www.cnn.com/2023/11/16/politics/trump-agenda-second-term/index.html [https://perma.cc/TK5B-YTDY]; Alexander Bolton, *Trump's call to defund DOJ, FBI puts Senate, House GOP at odds*, The Hill (Apr. 6, 2023, 6:00 a.m.), https://thehill.com/homenews/senate/3936557-trumps-call-to-defund-doj-fbi-puts-senate-house-gop-at-odds/ [https://perma.cc/C4XT-G2YU].

*Weiss*, Politico (Nov. 10, 2023, 2:05 p.m.), https://www.politico.com/news/2023/11/10/
hunter-biden-special-counsel-takeaways-00126639.[34]

The Government called witnesses to present testimony to a grand jury in
November and December 2023. (Selective Prosecution Opp'n 7.) The grand jury
returned an indictment on December 7, 2023. (Indictment.) In response, Mr. Comer
issued a statement:

> Two brave IRS whistleblowers, Gary Shapley and Joseph
> Ziegler, placed their careers on the line to blow the whistle on
> misconduct and politicization in the Hunter Biden criminal
> investigation. The Department of Justice got caught in its
> attempt to give Hunter Biden an unprecedented sweetheart
> plea deal and today's charges filed against Hunter Biden are
> the result of Mr. Shapley and Mr. Ziegler's efforts to ensure
> all Americans are treated equally under the law.

*Comer Statement on Hunter Biden Indictment*, U.S. House Comm. on Oversight &
Accountability (Dec. 7, 2023), https://oversight.house.gov/release/comer-statement-on-
hunter-biden-indictment/ [https://perma.cc/8Z7X-TJCH]. Eric Holder, a former United
States Attorney General, stated on cable television in December 2023 that former
United States Attorney colleagues uniformly told him they would not have brought the
charges against Defendant. He added:

> I think that he is, you know, being not targeted but treated
> perhaps a little differently because of who he is. There's a
> political component to this case, *which is not to say that the*
> *special prosecutor, Mr. Weiss, is doing anything*

---

[34] Although Mr. Weiss reportedly admitted "he is . . . concerned for his family's
safety," Woodruff Swan, *supra*, this outlet did not report that Mr. Weiss "and others in
his office faced death threats." (Selective Prosecution Mot. 7.)

41

1                 *inappropriate*, but I think there is certainly political pressure

2                 that exists in this case that you would not see with regard to

3                 other matters.

4    *Eric Holder: Hunter Biden charges wouldn't have been brought in normal scenario*,

5    CNN Politics (Dec. 7, 2023) (emphasis added), https://www.cnn.com/videos/politics/

6    2023/12/08/hunter-biden-eric-holder-reaction-sot-lcl-vpx.cnn [https://perma.cc/SRR3-

7    VZC5].[35]

8

9         **B.**     **Selective Prosecution**

10             1.    <u>Legal Standard</u>

11       Prosecutors have "'broad discretion' to decide whom to prosecute." *United States*

12    *v. Culliton*, 328 F.3d 1074, 1081 (9th Cir. 2003) (quoting *Wayte v. United States*, 470

13    U.S. 598, 607 (1985)). "[S]o long as the prosecutor has probable cause to believe that

14    the accused committed an offense defined by statute, the decision whether or not to

15    prosecute, and what charge to file or bring before a grand jury, generally rests entirely

16    in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

17       "Of course, a prosecutor's discretion is subject to constitutional restraints. One

18    of these constraints, imposed by the equal protection component of the Due Process

19    Clause of the Fifth Amendment, is that the decision whether to prosecute may not be

20    based on an unjustifiable standard such as race, religion, or other arbitrary

21    ─────────────────

22    [35] Mr. Holder, in relaying the position of unnamed colleagues, did not expressly state

23    that he would not have brought charges in the same situation, as Defendant implies.

     (*See* Selective Prosecution Mot. 17–18 ("Experienced legal experts agree, *including*

24    former Attorney General Eric Holder . . . ." (emphasis added)).) Further, as the

     Government points out, (Selective Prosecution Opp'n 9 n.5), the video clip Defendant

25    cited is a short excerpt of a longer interview with Mr. Holder. He went on to opine:

26    "This isn't some kind of ordinary run-of-the-mill tax case, that this was an abuse of the

     tax system . . . ." *Transcripts*, CNN (transcript of program aired Dec. 7, 2023),

27    https://transcripts.cnn.com/show/lcl/date/2023-12-07/segment/01    [https://perma.cc/

28    B6YJ-6QDE].

1    classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citations and
2    internal quotation marks omitted). "[A]n indictment that results from selective
3    prosecution will be dismissed." *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir.
4    2007).

5         To demonstrate selective prosecution, a defendant must show both
6    discriminatory effect and discriminatory purpose. *Armstrong*, 517 U.S. at 465. In other
7    words, a defendant "must demonstrate that (1) other similarly situated individuals have
8    not been prosecuted and (2) his prosecution was based on an impermissible motive."
9    *United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007).

10        Proving selective prosecution "is particularly demanding." *Reno v. Am.-Arab*
11   *Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999). Because "[a] selective-
12   prosecution claim asks a court to exercise judicial power over a special province of the
13   Executive," "in the absence of clear evidence to the contrary, courts presume that
14   [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S. at
15   464 (internal quotation marks omitted).

16

17              2.   Discussion
18        Defendant fails to present a reasonable inference, let alone clear evidence, of
19   discriminatory effect and discriminatory purpose. Accordingly, the selective
20   prosecution claim fails.

21

22              a.   *Discriminatory Effect*
23        Toward his burden to show similarly situated individuals have not been
24   prosecuted, Defendant offers two sets of comparators who resolved tax disputes civilly:
25   Robert and Susan Shaughnessy, and Roger and Nydia Stone. (Selective Prosecution

26

27

28

43

Mot. 18 n.56; Selective Prosecution Reply 5–6, ECF No. 48.)[36] Drawing the analogy more broadly, Defendant argues that "it is no secret that DOJ does not prosecute everyone who fails to file or pay taxes on time," and that "[t]he government does not generally bring criminal charges for failing to file or pay taxes." (Selective Prosecution Mot. 18 & n.56.)

In *Shaughnessy* and *Stone*, delinquent taxpayers agreed to civil consent judgments requiring them to pay unpaid income taxes and interest thereon. Consent J., *United States v. Stone*, 0:21-cv-60825-RAR (S.D. Fla. July 18, 2022), ECF No. 64; Consent J., *United States v. Shaughnessy*, No. 1:22-cv-02811-CRC (D.D.C. Apr. 18, 2023), ECF No. 10. Nothing in the record of the civil cases, let alone in the circumstances of the "countless others" the Government declines to prosecute, (Selective Prosecution Mot. 19), provides an inference that these individuals are similarly situated to Defendant with regard to indicia of criminal intent. Obviously, *Stone* and *Shaughnessy* were civil cases; intent was not a material element of the nonpayment counts at issue. *See generally* Compl., *United States v. Stone*, 0:21-cv-60825-RAR (S.D. Fla. April 16, 2021), ECF No. 1;[37] Compl., *United States v. Shaughnessy*, No. 1:22-cv-02811-CRC (D.D.C. Sept. 15, 2022), ECF No. 1. Although Defendant submits that only two of the factors indicative of willfulness set forth in the Department of Justice's *Criminal Tax Manual* apply to him, history of payment and

---

[36] At the hearing, Defendant's counsel offered as another comparator Milton Grimes, the subject of recently filed criminal tax charges in this district. Indictment, *United States v. Grimes*, No. 2:24-cr-00190-SB-1 (C.D. Cal. Mar. 21, 2024), ECF No. 1. Counsel argued that the alleged nonpayment of tax by Mr. Grimes was, if anything, more egregious than that alleged by Defendant. The prosecution of Mr. Grimes does nothing but undermine Defendant's proffer of "*similarly situated* individuals [who] have *not* been prosecuted." *Sutcliffe*, 505 F.3d at 954 (emphases added).

[37] Intent was an element to a claim for fraudulent transfer the United States brought against the Stones, which the United States eventually dismissed voluntarily. Joint Mot. for Entry of Consent J. 1, *United States v. Stone*, 0:21-cv-60825-RAR (S.D. Fla. July 15, 2022), ECF No. 63.

repeated violations, (Selective Prosecution Mot. 18), the Government's allegations in the indictment suggest otherwise. *Compare, e.g.*, U.S. Department of Justice, Tax Division, *Criminal Tax Manual* § 8.08[3][2] (2022) (identifying "[p]roviding accountant or return preparer with inaccurate and incomplete information" as a factor), https://www.justice.gov/tax/media/1338211/dl?inline [https://perma.cc/JZ2K-YQTP], *with* (Indictment ¶ 114 ("In working with the CA Accountants to prepare the returns, the Defendant claimed business expenses, including approximately $388,810 in business-related travel, despite having done little to no business in that year.")). In essence, Defendant argues that because most people do not suffer criminal charges for failing to pay taxes on time, he should not either. But adopting Defendant's position would ignore the numerous meaningful allegations about Defendant's criminal intent that are not necessarily shared by other taxpayers who do not timely pay income tax, including the Shaughnessys and Stones. (*See* Selective Prosecution Opp'n 2–4 (reviewing allegations).) Without a clear showing that the evidence going to criminal intent "was as strong or stronger than that against the defendant" in the cases of the Shaughnessys, the Stones, and other comparators, the Court declines to infer discriminatory effect. *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).[38]

Aside from comparators, Defendant offers mere rhetorical points toward discriminatory effect. Defendant supposes that the prosecution would not have brought charges against a similarly situated defendant based on the decisions of United States Attorneys to decline to partner on the case, and based on the beliefs of "[e]xperienced legal experts" as memorialized in a statement by Mr. Holder on cable television. (Selective Prosecution Mot. 17–18.) But the United States Attorneys reportedly offered explanations to Congress for their nonparticipation unrelated to their evaluation of the

---

[38] In his reply, Defendant proffers that Mr. Stone "wrote a memoir about his criminal actions," as Defendant is alleged to have done. (Selective Prosecution Reply 6 (emphasis removed).) That memoir is not before the Court, and its value as evidence in a putative criminal tax evasion case against Mr. Stone is unestablished.

strength of the case. Nelson, *supra*. Defendant and the Court can only guess what they think about the propriety of bringing the charges here. And the Court doubts hearsay statements about the opinions of unidentified prosecutors with unspecified knowledge about the charges and the evidence supporting them provide clear evidence of discriminatory effect. *See Eric Holder: Hunter Biden charges wouldn't have been brought in normal scenario*, *supra*. If anything, Mr. Holder's statements suggest he holds an opinion in tension with Defendant's: Mr. Holder expressly declined to state that Mr. Weiss was "doing anything inappropriate," *id.*, and he noted that Defendant's actions went beyond "some kind of ordinary run-of-the-mill tax case," *Transcripts*, *supra*. None of this amounts to the kind of clear evidence necessary to support Defendant's claim of selective prosecution. *Cf. United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989) (reversing denial of discovery to support claim of vindicative prosecution upon review of supporting affidavits); *United States v. Falk*, 479 F.2d 616, 623 (7th Cir. 1973) (reversing denial of discovery to support claim of selective prosecution in light of "the admission of the Assistant United States Attorney and the two published [policy] statements by the Selective Service officials which contradict the propriety of the action taken in this case").

### b.   *Discriminatory Purpose*

Defendant offers only conjecture about animus motivating the prosecutorial decisions in this case. The circumstantial allegations of animus he offers are thin. "The kind of intent to be proved is that the government undertook a particular course of action 'at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.'" *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (quoting *Wayte*, 470 U.S. at 610). As the Court's close reading of Defendant's literature review of reporting about his case demonstrates, Defendant provides no facts indicating that the Government undertook charging decisions in any respect because of public statements by politicians, let alone based on Defendant's familial and political

affiliations.[39] Defendant asserts that the Government made numerous prosecuting decisions between 2019 and 2023 without offering any substantiating proffer that such decisions were made before the Special Counsel decided to present the charges to the grand jury, let alone any proffer that anyone outside the Department of Justice affected those decisions, let alone any proffer that any of those decisions were made based on unjustifiable standards. For example, Defendant makes much ado about Messrs. Comer and Smith's public statements about the case, inferring that their actions in Congress influenced the course of the prosecution. Mr. Comer even claimed the charges would not have been brought if not for "whistleblower" testimony before the House Oversight Committee. *Comer Statement on Hunter Biden Indictment*, *supra*. But politicians take credit for many things over which they have no power and have made no impact. As counsel conceded at the hearing, just because someone says they influenced a prosecutorial decision does not mean that they did. Public statements by politicians hardly serve as evidence disturbing the "presumption of regularity" that attaches to prosecutorial decisions. *Armstrong*, 517 U.S. at 464 (internal quotation marks omitted).

---

[39] The Government argues that the motion should be denied because Defendant does not "identify facts that support any actual legal right that *he* exercised." (Selective Prosecution Opp'n 10.) The Government offers no authority to support its argument. In any event, courts recognize that "membership in a political party is protected by the First Amendment, and the mere exercise of that right cannot be punished by means of selective prosecution." *United States v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979); *see Wayte*, 470 U.S. at 608 ("T]he decision to prosecute may not be deliberately based upon an unjustifiable standard . . . including the exercise of protected statutory and constitutional rights."); *Falk*, 479 F.2d at 619–20 (recognizing draft resister's selective prosecution argument, reasoning that "just as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities"); *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) ("Steele is entitled to an acquittal if his evidence proved that the authorities purposefully discriminated against those who chose to exercise their First Amendment rights."). Defendant is the son of the President of the United States. His parentage confers a nigh immutable political affiliation. Prosecuting Defendant based on political animus surely would be an unjustifiable standard.

1  And the fact that the parties contemplated by 2021 at the latest the charges ultimately

2  brought against Defendant supports the presumption. (Selective Prosecution Opp'n Exs.

3  1–2.) The circumstantial evidence of animus is simply not strong enough to support a

4  claim of selective prosecution.

5        As to direct evidence of animus, Defendant submits that the Court should take as

6  truth reporting by the *New York Times* that "Mr. Weiss told an associate that he

7  preferred not to bring any charges, even misdemeanors, against Mr. Biden because the

8  average American would not be prosecuted for similar offenses." Schmidt et al., *supra*;

9  (*see* Selective Prosecution Mot. 13, 17). First, as Defendant concedes, the reporting

10  acknowledges that account is disputed. The identities of the person who conveyed the

11  statement to the reporters and the person who disputed the statement are unknown. No

12  one has presented testimony under penalty of perjury corroborating that Mr. Weiss

13  made this statement. *Cf. Adams*, 870 F.2d at 1146 ("Unless these men are perjuring

14  themselves, their testimony raises a significant question as to why this particular

15  prosecution was undertaken."). Second, the article suggests Mr. Weiss made that

16  statement (if at all) in "late 2022," when he reportedly "determined that he did not have

17  sufficient grounds to indict Mr. Biden for major felonies." Schmidt et al., *supra*. The

18  state of the evidence prosecutors had at that time, relative to when the parties struck the

19  putative plea deal half a year later and when the prosecutors presented the tax case to

20  the grand jury a year later, is uncertain on this record. Third, as the Government

21  persuasively notes, what Mr. Weiss might have meant by "the average American" in

22  relation to Defendant is unclear. (Selective Prosecution Opp'n 3–4, 11.) There are

23  several axes upon which Defendant is not an average American; for example, the

24  average American does not earn millions of dollars of income in a four-year period and

25  has not written a memoir allegedly memorializing criminal activity. A selective

26  prosecution of Defendant based on other of his atypical characteristics to which Mr.

27  Weiss's purported statement might have referred could be justifiable and permissible.

28  *See United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) ("Mere selectivity in

prosecution creates no constitutional problem.").  In short, the record leaves uncertain whether Mr. Weiss made this comment or, even if he did, that the comment reflected his state of mind when he made the ultimate charging decision or, even if it did, what exactly he meant by the statement.  There is no clear direct evidence of discriminatory purpose.

### C. Vindictive Prosecution

#### 1. Legal Standard

"A prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right." *United States v. Gamez-Orduno*, 235 F.3d 453, 462 (9th Cir. 2000) (citing *Bordenkircher*, 434 U.S. at 363).  "A defendant may establish vindictive prosecution (1) by producing direct evidence of the prosecutor's punitive motivation, or (2) by showing that the circumstances establish a reasonable likelihood of vindictiveness, thus giving rise to a presumption that the Government must in turn rebut." *United States v. Kent*, 649 F.3d 906, 912–13 (9th Cir. 2011) (cleaned up).  "[T]he mere *appearance* of vindictiveness is enough to place the burden on the prosecution," *United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 (9th Cir. 1976), but "the appearance of vindictiveness results only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights," *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982) (citing *United States v. Goodwin*, 457 U.S. 368, 384 (1982)).

"[A] prima facie case for vindictive prosecution requires that a defendant prove an improper prosecutorial motive through objective evidence before any presumption of vindictiveness attaches." *United States v. Alexander*, 287 F.3d 811, 818 (9th Cir. 2002); *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993) (requiring "[e]vidence indicating a realistic or reasonable likelihood of vindictiveness").

2.   <u>Discussion</u>

The parties do not cleanly delineate their discussion of Defendant's theory of selective prosecution from their discussion of his theory of vindictive prosecution. As the Ninth Circuit has recognized, there is "[l]ittle substantive difference . . . between selective prosecution and vindictive prosecution." *United States v. Wilson*, 639 F.2d 500, 502 (9th Cir. 1981). For many of the same reasons discussed in connection with the claim of selective prosecution, the vindictive prosecution claim fails for lack of objective direct or circumstantial evidence of vindictiveness.

Defendant asserts that a presumption of vindictiveness arises because the Government repeatedly "upp[ed] the ante right after being pressured to do so or Mr. Biden trying to enforce his rights." (Selective Prosecution Mot. 16.) Defendant alleges a series of charging decisions by the prosecution, (*id.* at 4–7), but the record does not support an inference that the prosecutors made them when Defendant says they did. In any event, a presumption does not arise here. "Particularly when a vindictiveness claim pertains to pretrial charging decisions, the Supreme Court urges deference to the prosecutor. Deference is appropriate for pretrial charging decisions because, 'in the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution.'" *United States v. Brown*, 875 F.3d 1235, 1240 (9th Cir. 2017) (citation omitted) (quoting *Goodwin*, 457 U.S. at 381). "[J]ust as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded." *Goodwin*, 457 U.S. at 380. Thus, "in the context of pretrial plea negotiations vindictiveness will not be presumed simply from the fact that a more severe charge followed on, or even resulted from, the defendant's exercise of a right." *Gamez-Orduno*, 235 F.3d at 462 (citation and internal quotation marks omitted).

Deference to the prosecutorial decision to bring charges, notwithstanding significant pretrial negotiations between the parties to avoid them, is warranted.

Defendant attempts to distinguish *Goodwin* and its progeny on the basis that "an agreement *had* been reached" to resolve the case. (Selective Prosecution Reply 7–8.) But the fact of the matter is that the Delaware federal court did not accept the plea, the parties discussed amendments to the deal they struck toward satisfying the court's concerns, and the deal subsequently fell through. That a plea was only one step away from the finish line does not diminish the deference the Court must give to the prosecution's decision to break off negotiations and pursue an indictment.

At best, Defendant draws inferences from the sequence of events memorialized in reporting, public statements, and congressional proceedings pertaining to him to support his claim that there is a reasonable likelihood he would not have been indicted but for hostility or punitive animus. As counsel put it at the hearing, "It's a timeline, but it's a juicy timeline." But "[t]he timing of the indictment alone . . . is insufficient" to support a vindictiveness theory. *Brown*, 875 F.3d at 1240; *see also United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981) (rejecting appearance-of-vindictiveness claim resting on "nothing more than the post hoc ergo propter hoc fallacy").

### D.   Discovery

"[T]he standard for discovery for a selective prosecution claim should be nearly as rigorous as that for proving the claim itself." *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018); *see Armstrong*, 517 U.S. at 468 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."). Thus, the defendant must provide "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (internal quotation marks omitted). The threshold to obtain discovery in aid of a vindictive prosecution claim similarly requires "some evidence." *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000); *see United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990) ("[A] criminal defendant may be entitled

1   to discovery if he or she establishes a prima facie showing of a likelihood of
2   vindictiveness by some evidence tending to show the essential elements of the
3   defense.”). The “some evidence” standard “is a rigorous one, itself a significant barrier
4   to the litigation of insubstantial claims.” *Sanders*, 211 F.3d at 717 (cleaned up).
5   “Whether a defendant claims selective prosecution or vindictive prosecution,
6   ‘examining the basis of a prosecution delays the criminal proceeding, threatens to chill
7   law enforcement by subjecting the prosecutor’s motives and decision-making to outside
8   inquiry, and may undermine prosecutorial effectiveness by revealing the Government’s
9   enforcement policy.’” *Id.* (quoting *Armstrong*, 517 U.S. at 465).

10  Defendant cannot meet this standard. In the technical sense, Defendant provided
11  virtually no evidence in support of his motion. And even if the Court credited the
12  sources Defendant cites in support of his claims, his proffer does not rise to the rigorous
13  standard required to justify discovery for the reasons discussed in the preceding
14  sections.

15
16  **E.    Separation of Powers**

17  “The doctrine of separation of powers is fundamental in our system. It arises,
18  however, not from Art. III nor any other single provision of the Constitution, but
19  because behind the words of the constitutional provisions are postulates which limit and
20  control.” *Nat’l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 590–91 (1949)
21  (internal quotation marks omitted). The Constitution does not require “a complete
22  division of authority between the three branches,” *Nixon v. Adm’r of Gen. Servs.*, 433
23  U.S. 425, 443 (1977), instead “enjoin[ing] upon its branches separateness but
24  interdependence, autonomy but reciprocity,” *Youngstown Sheet & Tube Co v. Sawyer*,
25  343 U.S. 579, 635 (1952) (Jackson, J., concurring). Still, “[t]he hydraulic pressure
26  inherent within each of the separate Branches to exceed the outer limits of its power,
27  even to accomplish desirable objectives, must be resisted.” *INS v. Chadha*, 462 U.S.
28  919, 951 (1983).

To this Court's knowledge, no federal court has dismissed an indictment for violation of the separation of powers. Only one published decision from a district court outside this circuit has even discussed such a challenge—and that court rejected it. *See generally United States v. Mardis*, 670 F. Supp. 2d 696 (W.D. Tenn. 2009). At the initial status conference in this matter, the Court noted the paucity of guiding authority on the separation-of-powers issue and invited counsel to provide "other case law out there that would be of interest to the Court," or, "if [*Mardis*] is the only case, [to] make sure that that's clear in the briefing." (Tr. 29–30, ECF No. 18.) Defendant has not cited any case other than *Mardis* for this issue in the briefing,[40] so the Court assumes the case stands alone, which is consistent with the Court's independent research.

The Court will not take the unprecedented step of dismissing an indictment for violation of separation-of-powers principles based on the public statements of current and former members of the political branches of the federal government. As in *Mardis*, the conduct of which Defendant complains is political commentary on the investigation and prosecution of alleged criminal conduct. There, a congressperson "actively sought a federal indictment" of the defendant. 670 F. Supp. 2d at 698. The *Mardis* court's reasoning is persuasive:

> [T]he Court is dubious that an individual legislator's interaction with executive branch officials could ever interfere with the authority of the executive in a way that would violate the separation of powers. To conclude otherwise would risk stifling the kind of interaction with the executive by legislators that the courts have countenanced as among the sundry activities frequently undertaken by congressmen and senators. . . . Legislators routinely express

---

[40] Defendant offers a passing citation of *Falk*, which dealt with a selective prosecution challenge. (Selective Prosecution Mot. 19 (citing *Falk*, 479 F.2d at 624).)

their opinions to executive branch officials about matters for
which their departments or agencies are responsible.
Defendant's position presumes that executive officials must
disregard these views and remain entirely free of their
influence in order to maintain the separation of powers, but
this is impracticable, unnecessary, and bears no relation to the
actual workings of the modern administrative state.
Furthermore, the adoption of Defendant's conception of the
separation of powers would surely hinder legitimate
congressional oversight of executive agencies. This
interaction among the branches is simply part of the vigorous
engagement that gives rise to the system of checks and
balances in our government. As the Supreme Court has said,
"Separation-of-powers principles are vindicated, not
disserved, by measured cooperation between the two political
branches of the Government, each contributing to a lawful
objective through its own processes."

*Id.* at 701–03 (citations and footnote omitted) (quoting *Loving v. United States*, 517
U.S. 748, 773 (1996)). This reasoning holds as extended to other individuals affiliated
with the political branches of the federal government. Hardly can the Court say that a
congressional committee or its chair, a president, or a prosecutor, former, present, or
future, should refrain from opining on the acts or inaction of federal prosecutors or else
risk subjecting criminal indictments to the threat of dismissal. Doing so would
effectively impose a gag order restricting the proper functioning of the system of checks
and balances implicit in the structure of the federal government.

In challenging the indictment for violation of the separation of powers, Defendant
essentially asks the Court to step beyond the bounds of its own constitutionally
enumerated ken. The executive branch has "absolute discretion to decide whether to

54

prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). With limited exceptions (such as the ones discussed in preceding sections of this Order), the exercise of prosecutorial discretion is "not subject to judicial review." *United States v. Molina*, 530 F.3d 326, 332 (5th Cir. 2008); *see also Wayte*, 470 U.S. at 607 ("This broad [prosecutorial] discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."). Accordingly, the Court will not recognize a novel challenge to prosecutorial discretion.

The Court does not opine on the merit of statements by individuals associated with the political branches designed to exert pressure over prosecutorial functions reserved to the executive. Instead, the Court acknowledges that the American system of federal government endorses the utterance of those statements, resists Defendant's invitation "to exceed the outer limits of its power" by sanctioning a heretofore unrecognized ground for usurping the exercise of prosecutorial discretion, *Chadha*, 462 U.S. at 951, and rejects the challenge.

**F.    Conclusion**

The motion is denied.

## V.    MOTION TO DISMISS THE INDICTMENT FOR DUE PROCESS VIOLATIONS BASED ON OUTRAGEOUS GOVERNMENT CONDUCT (ECF NO. 28)

Defendant argues that the indictment must be dismissed due to outrageous government conduct by Supervisory Special Agent Gary Shapley and Special Agent Joseph Ziegler, Internal Revenue Service case agents involved in the investigation of Defendant who allegedly disclosed to Congress and the media confidential grand jury information in breach of Rule 6(e) of the Federal Rules of Criminal Procedure and confidential tax return information in violation of 26 U.S.C. § 6103. (Outrageous Conduct Mot. 14–17, ECF No. 28.) In the alternative, Defendant asks the Court to

exercise its supervisory powers to dismiss the indictment due to Shapley and Ziegler's conduct. (*Id.* at 17–20.) The Government submits that dismissal is not a remedy for violation of § 6103. (Outrageous Conduct Opp'n 2–3, ECF No. 42.)[41] The Government further argues that Defendant has not met his burden to show the charges in this case resulted from Shapley and Ziegler's public statements. (*Id.* at 4–12.) Finally, the Government contends exercise of the Court's supervisory powers is unwarranted. (*Id.* at 12–15.)

### A.    Background

The Internal Revenue Service Criminal Investigation organization ("IRS-CI") is the federal law enforcement agency responsible for investigating potential criminal violations of the Internal Revenue Code. (Batdorf Decl. ¶ 1, ECF No. 42-1.) In December 2022, Shapley and Ziegler were members of an IRS-CI team assigned to the investigation of Defendant. (*Id.* ¶ 2.) The overseer of IRS-CI operations decided to remove Shapley and Ziegler from the investigative team in December 2022, though they ultimately were not removed until May 2023. (*Id.* ¶¶ 3–5.)

Starting in April 2023, Shapley and Ziegler and their counsel made public appearances in news media and sent correspondence to and testified before Congress about their participation in the IRS investigation against Defendant. (*See generally* Outrageous Conduct Mot. 3–13 (collecting links to media sources and congressional webpages).)[42] The Court assumes for the purpose of this motion that Shapley and

---

[41] The Court cites the publicly filed, redacted versions of the parties' briefs.

[42] As with his Motion to Dismiss for Selective and Vindictive Prosecution and Breach of Separation of Powers, Defendant largely supports this motion to dismiss with information sourced from the Internet, which is not evidence appropriate for consideration on a motion to dismiss. The motion may be denied on this basis. Nevertheless, to resolve the motion, the Court accepts for the sake of argument Defendant's proffer regarding Shapley and Ziegler's conduct. In the interest of judicial

Ziegler, themselves or through counsel, improperly disclosed confidential grand jury information in violation of Federal Rule of Criminal Procedure 6(e) and confidential tax return information in violation of 26 U.S.C. § 6103 on one or more of these occasions.[43]

A grand jury returned an indictment in this case on December 7, 2023. In response, Shapley and Ziegler issued a joint statement stating that "the indictment 'is a complete vindication of our thorough investigation, and underscores the wide agreement by investigators and prosecutors that the evidence supported charges against Hunter Biden.'" Brooke Singman, *IRS whistleblowers: Hunter Biden indictment is a 'complete vindication' of investigation, allegations*, Fox News (Dec. 8, 2023, 1:56 p.m.), https://www.foxnews.com/politics/irs-whistleblowers-hunter-biden-indictment-complete-vindication-investigation-allegations [https://perma.cc/FL5X-NE62].

### B.   26 U.S.C. § 6103

As a threshold issue, the Government contends that Defendant's challenge is incognizable insofar as it rests on Shapley and Ziegler's alleged violations of 26 U.S.C. § 6103. (Outrageous Conduct Opp'n 2–3.) Defendant does not meaningfully resist this argument, clarifying that "[h]e is not claiming that a Section 6103 violation alone warrants dismissal, but rather constitutes one more data point in the larger panoply of

---

economy, and for the reasons discussed in note 43, the Court does not recount their purported conduct in detail.

[43] The particulars of when and how Defendant asserts Shapley and Ziegler made these disclosures, and what their contents were, are immaterial to this Order. The Court declines to make any affirmative findings that Shapley and Ziegler violated these rules given the pending civil case Defendant brought against the IRS related to the alleged disclosures, *see generally* Complaint, *Biden v. U.S. IRS*, No. 1:23-cv-02711-TJK (D.D.C. Sept. 18, 2023), ECF No. 1, and the potential for criminal prosecution of such violations. But the Court need not resolve whether their public statements ran afoul of these nondisclosure rules to decide the motion.

government misconduct that, when taken together, demonstrates an obvious and gross violation of his constitutional rights." (Outrageous Conduct Reply 4, ECF No. 49.)

The Court assumes the motion is incognizable to the extent it rests on § 6103 violations, as the Ninth Circuit has counseled against dismissal of criminal charges as a remedy for such violations. *See United States v. Michaelian*, 803 F.2d 1042, 1043 (9th Cir. 1986) ("This Court has previously demonstrated its reluctance to imply a judicial remedy for violations of § 6103 given Congress' explicit provision of a remedy. . . . Indeed, no court has held that a § 6103 violation warrants dismissal or suppression."); *cf.* 26 U.S.C. § 7431 (providing civil remedy for unauthorized disclosures under § 6103).[44]

### C.  Outrageous Government Conduct

#### 1.  Legal Standard

Due process principles allow a federal court to dismiss a prosecution based on outrageous government conduct. *United States v. Pedrin*, 797 F.3d 792, 795 (9th Cir. 2015). "A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)); *see also Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) (Powell, J., concurring) ("Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction."). "Dismissing an indictment for outrageous government conduct, however, is limited to extreme cases in which the

---

[44] That said, remedies other than dismissal may address improper disclosure of grand jury information, but the Supreme Court has suggested that a court could exercise supervisory powers to dismiss an indictment for Rule 6(e) violations. *See Bank of N.S. v. United States*, 487 U.S. 250, 259–63 (1988). The Court's decision on this motion would not materially change if its assumption is improper.

defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (internal quotation mark omitted).

"There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so every case must be resolved on its own particular facts." *Id.* (internal quotation marks omitted). "Constitutionally unacceptable conduct includes, but is not limited to, situations where law enforcement agents employed unwarranted physical or mental coercion, where government agents engineer and direct the criminal enterprise from start to finish, and where the government essentially manufactures new crimes in order to obtain the defendant's conviction." *United States v. Stenberg*, 803 F.2d 422, 429 (9th Cir. 1986) (citations and internal quotation marks omitted), *abrogated by statute on other grounds as stated in United States v. Atkinson*, 966 F.2d 1270, 1273 n.4 (9th Cir. 1992). But "the outrageous conduct defense is generally unavailable where the criminal enterprise was already in progress before the government became involved or where the defendant was involved in a continuing series of similar crimes during the government conduct at issue." *Id.*

"The standard for dismissal on this ground is extremely high." *Pedrin*, 797 F.3d at 795 (internal quotation marks omitted); *see also United States v. Ryan*, 548 F.2d 782, 789 (9th Cir. 1976) ("[T]he due process channel which *Russell* kept open is a most narrow one . . . ."); *Black*, 733 F.3d at 302 ("[T]here are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine."); *United States v. Sapper*, No. 2:12-cr-00435-GMN-CWH, 2013 U.S. Dist. LEXIS 128939, at *7–8 (D. Nev. Apr. 15, 2013) ("To be sure, the only successful assertion of outrageous government conduct in the Ninth Circuit was in *Greene v. United States*, 454 F.2d 783

(9th Cir. 1971), which predates *Russell* and *Hampton*."), *R. & R. adopted*, 2013 U.S. Dist. LEXIS 128941 (D. Nev. Sept. 10, 2013).[45]

2.  Discussion

The parties do not cite, and the Court has not found, any authority invoking the outrageous government conduct doctrine to dismiss a prosecution in any situation remotely analogous to the one presented here. Shapley and Ziegler's conduct does not fall into any of the recognized grounds for application of the defense. *See Stenberg*, 803 F.2d at 429.

The two cases the parties cite in which Ninth Circuit courts ratified an outrageous government conduct defense offer poor analogs. In *Greene*, an undercover government agent involved himself "directly and continuously over . . . a long period of time in the creation and maintenance of criminal operations," "enmesh[ing the government] in criminal activity, from beginning to end." 454 F.2d at 787. Defendant offers no facts to suggest Shapley and Ziegler catalyzed the underlying crimes of which he is accused.[46]

In *United States v. Marshank*, the prosecution "actively collaborated" with the defendant's attorney, Ron Minkin, "to build a case against the defendant" and "colluded with Minkin to obtain an indictment against the defendant, to arrest the defendant, to ensure that Minkin would represent the defendant despite his obvious conflict of interest, and to guarantee the defendant's cooperation with the government." 777 F.

---

[45] Contrary to Defendant's representation, the circuit panel in *Stenberg* did not "dismiss[ an] indictment for outrageous government conduct." (Outrageous Conduct Mot. 15); *see Stenberg*, 803 F.2d at 430 ("[W]e conclude that the outrageous government conduct defense is unavailable.").

[46] And there is cause to question whether *Greene* was an outrageous government conduct case at all. *See United States v. Rogers*, No. 2:22-cr-00064-APG-EJY, 2023 U.S. Dist. LEXIS 104207, at *5 n.2 (D. Nev. May 22, 2023) (citing *United States v. Haas*, 141 F.3d 1181, 1998 WL 88550, at *1 (9th Cir. May 3, 1998) (unpublished table decision), to question whether *Greene* even arose under the doctrine), *R. & R. adopted*, 2023 U.S. Dist. LEXIS 103250 (D. Nev. June 12, 2023).

Supp. 1507, 1524 (N.D. Cal. 1991). Defendant does not accuse Shapley and Ziegler of misconduct in the process of building the case against him or any active collaboration between them and the prosecution; instead, he posits that their public disclosures of information about the investigation might have impacted the Special Counsel's decision to pursue the tax charges. (Outrageous Conduct Reply 10 ("There is no doubt that the agents' actions in spring and summer 2023 substantially influenced then-U.S. Attorney Weiss's decision to renege on the plea deal last summer, and resulted in the now-Special Counsel's decision to indict Biden in this District.").) His theory rests on a speculative inference of causation supported only by the sequence of events. For example, Defendant supposes that Shapley and Ziegler's joint statement regarding the indictment, in which they claimed "complete vindication of [their] thorough investigation," shows that the indictment "was a *direct result* of Ziegler and Shapley's public conduct." (*Id.* at 3–4 (internal quotation marks omitted).) Hardly so. As discussed in the context of the previous motion, publicly taking credit for a prosecution hardly proves the boaster's conduct had any effect on the presumably independent prosecutor. This is a far cry from *Marshank*, where the court made robust findings of fact about the prosecution's active encouragement of the misconduct after an evidentiary hearing, which Defendant has not requested to ventilate his postulation.

Reaching outside this circuit, the Court finds the Second Circuit's opinion in *United States v. Walters*, 910 F.3d 11 (2d Cir. 2018), a compelling analog. There, the FBI investigated the defendant for suspicious securities trading. *Id.* at 16. The supervisor of the primary case agent for the investigation, David Chaves, provided information about the investigation to several reporters. *Id.* at 16–18. Chaves continued to communicate with reporters about the investigation even after he was instructed to cease contact with the media. *Id.* at 18. The district court, assuming that Chaves improperly disclosed grand jury information in violation of Federal Rule of Criminal Procedure 6(e), denied the defendant's motion to dismiss based on the outrageous government conduct doctrine. *Id.* at 20–21. The circuit panel affirmed:

61

1
2
3
4
5
6
7
8
9
10
11

> Although the misconduct at issue is deeply disturbing and
> perhaps even criminal, it simply is not commensurate with the
> conduct in those cases where indictments were dismissed for
> coercion or violations of bodily integrity. The Court certainly
> does not condone the conduct, but we are hard-pressed to
> conclude that the leaking by a government official of
> confidential information to the press shocks the conscience.
> While there may be circumstances where strategic leaks of
> grand jury evidence by law enforcement rises to the level of
> outrageous conduct sufficient to warrant dismissal, those
> circumstances are not present here.

12 *Id.* at 28 (internal quotation marks and citation omitted).

13      The Court agrees with the reasoning of the *Walters* panel. Shapley and Ziegler's
14 alleged public disclosures of confidential information, even if assumed to be "deeply
15 troubling," *id.* at 26, simply do not shock the conscience to the level other recognized
16 bases for dismissal do. The Court perceives no meaningful basis upon which to
17 distinguish *Walters* from this case.[47] Given the "extremely high" standard for dismissal
18 on this ground, *Pedrin*, 797 F.3d at 795 (internal quotation marks omitted), the Court
19 declines to dismiss the indictment based on Shapley and Ziegler's conduct.[48]

20

21 [47] At the hearing, Defendant's counsel asserted that Shapley and Ziegler's conduct was
22 more outrageous given the methods by and frequency with which they made their public
23 disclosures over admonitions not to do so. This is not a persuasive ground for
   distinguishing *Walters*, where Chaves provided as many as four reporters information
24 about an investigation he oversaw over the course of 16 months. 910 F.3d at 17–18.
25 And it bears noting that *Walters* was decided on an evidentiary record.

   [48] The Government advances a rule that "the defendant must show that the charges
26 *resulted from*" the outrageous government conduct to show a due process violation.
27 (Outrageous Conduct Opp'n 4–9.) Though the Government's presentation is
   persuasive, the Court stops short of adopting that rule. It is true that courts often consider
28 the doctrine in contexts where the defendant asserts the offending government conduct

62

1 **D.     Supervisory Powers**

2     1.     <u>Legal Standard</u>

3     "A district court may dismiss an indictment under its inherent supervisory powers
4 (1) to implement a remedy for the violation of a recognized statutory or constitutional
5 right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate
6 considerations validly before a jury; and (3) to deter future illegal conduct." *United*
7 *States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (internal quotation marks omitted).
8 This power "is premised on the inherent ability of the federal courts to formulate
9 procedural rules not specifically required by the Constitution or the Congress to
10 supervise the administration of justice." *United States v. De Rosa*, 783 F.2d 1401, 1406
11 (9th Cir. 1986). Exercise of supervisory powers is appropriate even without a due
12 process violation, as such exercise aims to "protect[] the integrity of the federal courts
13 and prevent[] the courts from 'making . . . themselves accomplices in willful
14 disobedience of law.'" *Bundy*, 968 F.3d at 1030 (quoting *McNabb v. United States*, 318
15 U.S. 332, 345 (1943)).

16

17 ───────────────

18 played a causal role in the commission, charge, or conviction of a crime. (*Id.* at 7–8
19 (summarizing *Russell*, 411 U.S. 423; *Pedrin*, 797 F.3d 792; *United States v. Combs*,
   827 F.3d 790 (8th Cir. 2016); *Stenberg*, 803 F.2d 422; *United States v. Garza-Juarez*,
20 992 F.2d 896 (9th Cir. 1993); and *Marshank*, 777 F. Supp. 1507).) And the
21 Government's proposed rule aligns with the proposition that "the outrageous conduct
   defense is generally unavailable" where the crime is in progress or completed before
22 the government gets involved. *Stenberg*, 803 F.2d at 429. But the Ninth Circuit teaches
23 that there is no one-size-fits-all rule for application for the doctrine, *see Black*, 733 F.3d
   at 302 ("There is no bright line dictating when law enforcement conduct crosses the line
24 between acceptable and outrageous, so every case must be resolved on its own particular
25 facts." (internal quotation marks omitted)), and nothing in the Supreme Court's
   acknowledgment of the doctrine mandates that the offending misconduct play some
26 causal role in the commission of the crime or the levying of charges, *see Russell*, 411
27 U.S. at 431–32. The Court takes the Second Circuit's cue and leaves the door open to
   challenges based on "strategic leaks of grand jury evidence by law enforcement."
28 *Walters*, 910 F.3d at 28.

2.   <u>Discussion</u>

The Court assumes dismissal might be warranted for Shapley and Ziegler's purported violation of Rule 6(e). *See Bank of N.S. v. United States*, 487 U.S. at 259–63 (1988); *Bundy*, 968 F.3d at 1030 (recognizing supervisory powers may be used "to implement a remedy for the violation of a recognized statutory or constitutional right"). But the Court declines to exercise its supervisory powers to provide a remedy to address Shapley and Ziegler's conduct. Exercise of supervisory authority to dismiss an indictment for wrongful disclosure of grand jury information is not appropriate unless the defendant can show prejudice. *Walters*, 910 F.3d at 22–23 (citing *Bank of N.S.*, 487 U.S. at 254–55). In other words, "dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of N.S.*, 487 U.S. at 256 (internal quotation marks omitted).

Defendant focuses his argument on Shapley and Ziegler's influence on the prosecutor's decision to pursue tax charges. (Outrageous Conduct Mot. 19 (insisting the agents "pressured the prosecution's hand").) Aside from failing to substantiate his allegations that the agents influenced the prosecutorial decision with anything but speculation, Defendant offers no case in which a court exercised supervisory powers to dismiss an indictment due to conduct that impacts the fundamental decision to prosecute.[49]

Instead, relevant precedents focus on the effect of any wrongful disclosure on the fairness of the grand jury process. *E.g.*, *Bank of N.S.*, 487 U.S. at 259 (focusing on the question of "whether, despite the grand jury's independence, there was any misconduct

---

[49] Just as the Court doubts the wisdom of reviewing a challenge to the legislature's exertion of pressure on the prosecutorial decisions of the executive, the Court similarly doubts whether it should decide that one hand of the executive wrongfully influenced the other. *See supra* section IV(E).

by the prosecution that otherwise may have influenced substantially the grand jury's decision to indict, or whether there is grave doubt as to whether the decision to indict was so influenced"); *Walters*, 910 F.3d at 18–19, 23–24 (following *Bank of N.S.* and rejecting as speculative the defendant's claim that a witness whose anticipated trial testimony was presented to the grand jury chose to cooperate due to Rule 6(e) leaks); *United States v. Samango*, 607 F.2d 877, 884–85 (9th Cir. 1979) (affirming exercise of supervisory power where "the prosecutor's behavior" in his presentation to the grand jury "has exceeded the limits of acceptability"). Defendant offers no facts to suggest that the information Shapley and Ziegler shared publicly had any prejudicial effect on the grand jury's decision to return an indictment. That Shapley and Ziegler's public statements brought notoriety to Defendant's case is not enough to show prejudice.[50] *See United States v. Woodberry*, 546 F. Supp. 3d 180, 188 (E.D.N.Y. 2021) ("[A]dverse pretrial publicity is not a sufficient ground to dismiss an indictment."). Absent some indication that their public disclosures rendered the grand jury process unfair, *Bank of N.S.*, 487 U.S. at 256, the Court finds exercise of its supervisory powers unwarranted.[51]

### E.    Conclusion

The motion is denied.

---

[50] As noted previously, Defendant himself brought notoriety to his conduct though the publication of a memoir.

[51] Defendant also encourages the Court to exercise its supervisory powers to remedy other defects he perceives in his treatment by the federal government, including the prosecution's decision to renege on the Diversion Agreement and bring tax charges, and the prejudice generated by the publicity of his case. (Outrageous Conduct Mot. 18–19.) He also suggests the Court could exercise its supervisory powers to remedy outside influence on the prosecution. (Selective Prosecution Mot. 11 n.31.) Whether these issues are considered separately or together with Shapley and Ziegler's conduct, the Court does not find exercise of its supervisory powers appropriate here.

1  **VI.  MOTION TO DISMISS COUNT 1 AS UNTIMELY OR, IN THE**
2  **ALTERNATIVE, TO DISMISS ALL COUNTS FOR FAILURE TO**
3  **STATE A CLAIM AND LACK OF SPECIFICITY (ECF NO. 29)**

4      Count 1 charges Defendant with a willful failure to pay his 2016 taxes in violation
5  of 28 U.S.C. § 7203. Defendant argues that this count is untimely, as the willful conduct
6  giving rise to the charge occurred on April 18, 2017. Given that violations of 28 U.S.C.
7  § 7203 are subject to a six-year statute of limitations, Defendant argues that the statute
8  of limitations for his willful failure to pay his 2016 taxes ran out on April 18, 2023. (*See*
9  *generally* SOL Mot., ECF No. 29.) The Government responds that the indictment
10  identifies the date willfulness for the offense arose as June 12, 2020, (Indictment ¶ 65),
11  well within the six-year statute of limitations. (*See generally* SOL Opp'n, ECF No. 38.)

12      Anticipating this position, Defendant argues, in the alternative, that if Count 1 is
13  timely, then all of the remaining counts fail under Federal Rule of Criminal Procedure
14  12(b)(3)(B)(v) because they allege willfulness on the date taxes were due. In other
15  words, if the due date for payment did not establish willfulness for Count 1, the
16  Government cannot use the due date to establish willfulness for the remaining counts.
17  Defendant asks the Government to clarify its position and argues a failure to do so
18  violates the specificity requirements of Rules 7(c) and 12(b)(3)(B)(iii). (SOL Mot. 9–
19  11.)

21      **A.   Legal Standards**

22           1.   Statute of Limitations

23      A defendant may raise a statute of limitations defense in a motion under Federal
24  Rule of Criminal Procedure 12(b). *United States v. Smith*, 866 F.2d 1092, 1095 n.3 (9th
25  Cir. 1989). The statute of limitations for a willful failure to pay income tax in violation
26  of 26 U.S.C. § 7203, the offense charged in Count 1, is six years. 26 U.S.C. § 6531(4).
27  The statute of limitations on an offense begins to run when all of the elements are
28  present and the crime is complete. *United States v. Musacchio*, 968 F.2d 782, 790 (9th

Cir. 1991). When considering a motion to dismiss a criminal offense as untimely prosecuted, "the trial court [is] limited to the face of the indictment and [is] obliged to accept the facts therein alleged as true." *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir. 1954).

### 2.   Failure to State an Offense and Lack of Specificity

Rule 12(b)(3) permits a criminal defendant to move to dismiss an indictment based on "a defect" therein, including "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). Rule 7(c)(1) requires an indictment to describe in "plain, concise, and definite" terms the "essential facts" supporting each element. To pass constitutional muster, an indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend" and "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (internal quotation marks omitted).

### B.   Discussion

#### 1.   Count 1: Statute of Limitations

Defendant argues the statute of limitations for Count 1 ran on April 18, 2023, and because the charge was not filed until December 2023, it must be dismissed. (SOL Mot. 1.) Defendant accuses the Government of engaging in artful pleading to avoid a statute of limitations problem on Count 1 by alleging Defendant's willful failure to pay individual income taxes for 2016 arose on June 12, 2020, rather than on April 18, 2017. (*Id.* at 1, 6–9.) In support of his argument, Defendant contrasts the Government's allegations as to Count 1 with other counts in which the Government argues Defendant's purported willful failure to pay taxes in other years arose either on the date taxes were

due but not paid or on the date Defendant filed his Form 1040s but did not pay taxes due. (*Id.* at 6–9.)[52]

The Government argues the statute of limitations did not begin to run on Count 1 until June 12, 2020, when Defendant submitted his delinquent return without payment, and that willfulness allegations must be assessed uniquely as to each count. (SOL Opp'n 3, 8–9.) The Government explains that it charged Defendant with willful failure to pay his 2016 individual income taxes on June 12, 2020, because it believes it can prove Defendant's conduct was willful and all elements of 26 U.S.C. § 7203 were completed on that date. (*Id.* at 7–9.)[53] For instance, unlike in counts pertaining to other years, the Government alleges Defendant's conduct was not willful at the time taxes were due but not paid because Defendant made some effort to timely file his 2016 Form 1040 and pay taxes due, (Indictment ¶¶ 53, 56–57), and he in fact believed that he timely filed his 2016 Form 1040 and paid his taxes timely, (*id.* ¶ 58).

Willfulness is a fact-specific inquiry that is to be determined by the trier of fact on each charge. *See United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984) ("[W]illfulness may be inferred by the trier of fact from all the facts and circumstances of the attempted understatement of tax."); *see also Wilson v. United States*, 250 F.2d 312, 325 (9th Cir. 1957) ("Whether particular conduct is 'willful' is, of course, a question of fact."). The Court must accept the allegations in the indictment as true, *Winslow*, 216 F.2d at 913, including allegations tending to show willfulness did not arise until June 12, 2020. When willfulness arose as to Count 1, if at all, is factual question that should be left to the jury.

Therefore, Defendant's motion to dismiss Count 1 as untimely is denied.[54]

---

[52] As discussed in section VII(B)(1) *infra*, the Government may maintain alternate theories as to when willfulness arose.

[53] Also as discussed in section VII(B)(1) *infra*, the Government's theory is cognizable because willfulness can arise well after the date tax is due.

[54] In its opposition, the Government pointed to two tolling agreements Defendant

1          2.      <u>Counts 1–9: Failure to State an Offense and Lack of Specificity</u>

2              a.      *Rule 12(b)(3)(B)(v)*

3          Defendant asserts that if his purported willfulness as to Count 1 arose for the first

4    time in June 2020, as the Government proffers, then all counts must be dismissed for

5    failure to state an offense pursuant to Federal Rule of Criminal Procedure

6    12(b)(3)(B)(v). (SOL Mot. 2.) Said differently, Defendant argues that if the

7    Government does not allege that he willfully failed to pay his 2016 taxes at the time

8    they were due in 2017, then the Government cannot allege Defendant willfully failed to

9    pay his taxes for other tax years on the date those taxes were due.  (*Id.*)

10         Defendant's challenge is peculiar. Defendant does not assert that the Government

11   failed to state the offenses against him. (*See generally* SOL Mot.) Rather, he takes issue

12   with *how* the Government charged the offenses—by proffering different theories of

13   willfulness for separate charges. Essentially, Defendant asks the Court to make a factual

14   determination as to when willfulness arose on all counts. This is not the proper subject

15   of a Rule 12(b)(3)(B)(v) motion, which is brought to determine if "[t]he

16   indictment . . . states an offense or it doesn't." *United States v. Boren*, 278 F.3d 911,

17   914 (9th Cir. 2002). Even though Defendant makes no cogent failure-to-state-an-

18   offense challenge, the Court has reviewed the indictment and finds that it adequately

19   states all nine offenses under Rule 12(b)(3)(B)(v). (Indictment ¶¶ 49–160.)

20         Therefore, Defendant's motion to dismiss all counts for failure to state an offense

21   fails.

22   _____

23   entered into with the United States Attorney's Office for the District of Delaware and
24   the United States Department of Justice, Tax Division, tolling the statues of limitations
25   on any potential tax charges from July 1, 2021, through March 1, 2022, and from March
     2, 2022, through June 15, 2022. (*See* SOL Opp'n Exs. 1–2, ECF Nos. 38-1 to 38-2.)
26   Application of these tolling agreements would have made a crime completed on April
27   18, 2017, and subject to a six-year statute of limitations, timely in a December 2023
     indictment. However, neither the Government nor Defendant presently argues that the
28   tolling provisions in these agreements apply to the present action.

1                    b.     *Rules 7(c) and 12(b)(3)(B)(iii)*

2        In ruling on a motion to dismiss an indictment for lack of specificity, the Court

3 must review an indictment "in its entirety, construed according to common sense, and

4 interpreted to include facts which are necessarily implied." *United States v. Berger*, 473

5 F.3d 1080, 1103 (9th Cir. 2007) (internal quotation marks omitted). "[A] legally

6 sufficient indictment must state the elements of the offense charged with sufficient

7 clarity tco apprise a defendant of the charge against which he must defend and to enable

8 him to plead double jeopardy." *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir.

9 2000).

10        Here, Defendant seems to argue that if the Government proceeds with its theory

11 that he willfully failed to pay his 2016 individual income taxes in June 2020 and not

12 when taxes were due in April 2017, then the Government has failed to specify its

13 willfulness allegations for all other counts. (SOL Mot. 10.) This argument suggests that

14 Defendant cannot assess from the indictment the grounds for the charges if the

15 Government pursues a late-arising willfulness theory on Count 1.

16        Defendant's argument is untenable. The Government has provided a fulsome

17 "statement of the facts and circumstances that . . . inform[s] the [Defendant] of the

18 specific offense[s] with which he is charged." *United States v. Blinder*, 10 F.3d 1468,

19 1476 (9th Cir. 1993). The indictment lists all offenses charged and all facts on which

20 the Government bases its charges. (*See* Indictment ¶¶ 49–160); *cf. United States v.*

21 *Ogbazion*, No. 3:15-cr-104, 2016 WL 6070365, at *16 (S.D. Ohio Oct. 17, 2016) ("[A]n

22 indictment is legally deficient where it fails to set forth facts which constitute an offense

23 or to identify the essential elements of the offense."). The Government's unique

24 willfulness theory on Count 1 does not render indecipherable its willfulness theory on

25 the other counts. It is hard to imagine what further details Defendant could require to

26 understand the charges against him and to prepare his defense.

27        Because the Court finds the indictment is legally sufficient, Defendant's motion

28 to dismiss all counts is denied.

**C.     Conclusion**

Defendant's motion is denied.

## VII.    MOTION TO DISMISS COUNTS 2, 4, AND 6 OF THE INDICTMENT IN PART FOR DUPLICITY (ECF NO. 30)

Defendant asks the Court dismiss Counts 2, 4, and 6 of the indictment in part because he claims they contain duplicative charges. (*See generally* Duplicity Mot., ECF No. 30.) The Government explains in opposition that while Counts 2, 4 and 6 each contains alternate contentions by which Defendant is alleged to have committed elements of the charged offense, each count contains a single charge. (*See generally* Duplicity Opp'n, ECF No. 39.)

**A.     Legal Standard**

"An indictment is considered duplicitous if a single count combines two or more offenses." *United States v. Renteria*, 557 F.3d 1003, 1007 (9th Cir. 2009). An indictment is not duplicitous when it "merely state[s] multiple ways of committing the same offense." *United States v. Arreola*, 467 F.3d 1153, 1161 (9th Cir. 2006). This is because "[s]ome crimes can be committed by several alternative means," and "[i]t is proper for the government to charge different means of a crime connected by conjunctions in the indictment when the means are listed disjunctively in the statute." *Renteria*, 557 F.3d at 1008.

**B.     Discussion**

1.     <u>Counts 2 and 4</u>

Count 2 charges Defendant with willfully failing to pay his 2017 taxes, (Indictment 21), and Count 4 charges Defendant with willfully failing to pay his 2018 taxes, (*id.* at 28), both in violation of 26 U.S.C. § 7203. Counts 2 and 4 allege Defendant's willfulness arose on two dates, the date the taxes were due but not paid and

71

1    the date Defendant filed his delinquent returns but did not pay a tax due. (*See id.* ¶¶ 89,

2    105.) Defendant argues that Counts 2 and 4 each contain two separate alleged violations

3    of 26 U.S.C. § 7203 because they "require analysis of different time periods . . . and

4    different alleged actions or inactions by Mr. Biden." (Duplicity Mot. 3.)

5        There are two elements of willful failure to pay taxes pursuant to 26 U.S.C.

6    § 7203: willfulness and failure to pay tax. *United States v. DeTar*, 832 F.2d 1110, 1113

7    (9th Cir. 1987). On a failure-to-pay charge, willfulness can arise either when payment

8    is due or at a later time. *See United States v. Andros*, 484 F.2d 531, 532–33 (9th Cir.

9    1973) (finding Defendant's willfulness arose after payment was due), *effectively*

10   *overruled on other grounds by United States v. Easterday*, 564 F.3d 1004, 1005 (9th

11   Cir. 2009);[55] *see also United States v. Pelose*, 538 F.2d 41, 44–45 (2d Cir. 1976)

12   (finding the jury was correctly instructed it could find defendant's willfulness arose

13   after the date payment was due); *United States v. Sams*, 865 F.2d 713, 716 (6th Cir.

14   1988) (agreeing with *Andros* that willfulness can arise at a date later than when payment

15   is due).

16       "Willfulness" is an essential element of 26 U.S.C. § 7203. Because "willfulness"

17   can be found either on the date taxes are due or at a later date, the Government's

18   inclusion of multiple dates on which Defendant allegedly committed the crime is merely

19   the Government "stat[ing] multiple ways of committing the same offense," *Arreola*,

20   467 F.3d at 1161.

21       *Arreola* offers a persuasive analogy. There, the defendant challenged his

22   conviction under 18 U.S.C. § 924(c)(1)(A), a statute providing minimum sentences for

23

24   _____

25   [55] In *Easterday*, the Ninth Circuit overruled *Andros*'s holding that willfulness arose
     when the defendant had sufficient funds to pay his delinquent taxes but failed to do so.

26   However, *Easterday* did not disturb *Andros*'s finding that willfulness can arise at a later

27   date. *See generally Easterday*, 564 F.3d 1004. This part of the *Andros* reasoning merely
     applies the rule that "[a] crime is complete as soon as every element of the crime

28   occurs." *United States v. Musacchio*, 968 F.2d 782, 790 (9th Cir. 1991).

a person who, "in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," on the basis that the indictment was duplicitous insofar as it charged him with both carrying and possessing a firearm. *Id.* at 1155–56, 1161. The circuit court confirmed that the statute "creates only one offense." *Id.* at 1157. Thus, the panel determined, the indictment was not duplicitous because it "merely state[d] multiple ways of committing the same offense." *Id.* at 1161.[56] Similarly, here the Government alleges that the willfulness element supporting Counts 2 and 4 arose on two dates, the date Defendant's taxes were due but not paid and the date he filed delinquent returns. The Government does not submit that two separate offenses occurred in each of Counts 2 and 4 on both dates; instead, it proffers two alternative theories of the date willfulness arose to support the violation in each count.[57] The Government can plead two theories of one offense without creating a duplicity issue. *Arreola*, 467 F.3d at 1161; *see also* Fed. R. Crim. P. 7(c)(1) ("A count may allege . . . that the defendant committed it by one or more specified means."). Defendant has not met his burden to show Counts 2 and 4 are duplicitous.

## 2.   Count 6

Count 6 charges Defendant with tax evasion for tax year 2018 in violation of 26 U.S.C. § 7201. (Indictment 33.) Count 6 alleges Defendant evaded an assessment of his 2018 individual income taxes by submitting a fraudulent Form 1040 and by claiming personal expenses as business expenses on a Form 1120. (*Id.* ¶ 145.) Defendant argues

---

[56] The panel thus rejected the defendant's claim that jury instructions mirroring the language of the indictment violated his Sixth Amendment rights. *Arreola*, 467 F.3d at 1161.

[57] Although 26 U.S.C. § 7203 does not disjunctively state willfulness may arise on the date taxes are due or at a later date, *Renteria*, 557 F.3d at 1008, the Court follows other courts' interpretations that the statute permits a jury to find willfulness either on the date payment was due or at a later date.

that "Count 6 is defective because a jury will have to analyze different requirements based on each of the tax forms that are included in the count." (Duplicity Mot. 3.)

To prove a violation of 26 U.S.C. § 7201, the Government must show an affirmative act constituting an attempt to evade or defeat tax, an additional tax due and owing, and willfulness. *Sansone v. United States*, 380 U.S. 343, 351 (1965). Contrary to Defendant's argument, the jury may consider multiple tax returns in assessing whether a defendant violated 26 U.S.C. § 7201. A circuit panel confirmed this principle in a recent published decision, *United States v. Orrock*, 23 F.4th 1203 (9th Cir. 2022). The defendant in *Orrock* argued that the statute of limitations barred his conviction under § 7201; he claimed that the statute of limitations ran from the date he filed a personal tax return, not the later date he filed a partnership return. *Id.* at 1205–06. The panel affirmed the conviction, concluding that the statute of limitations "runs from the last act necessary to complete the offense, either a tax deficiency or the last affirmative act of evasion, whichever is later." *Id.* at 1105. Although the panel did not expressly consider a duplicity challenge, its reasoning implicitly rests on the principle that a prosecutor may charge a violation of § 7201 based on the preparation of different tax forms, which constitute different acts of evasion that may support the count.[58] This comports with the statutory context of § 7201, which shows "Congress desired to impart a significant degree of flexibility into the Government's charging decision." *United States v. Yagman*, CR 06-227(A) SVW, 2007 WL 9724388, at *9 (C.D. Cal. May 3,

---

[58] Defendant distinguishes *Orrock* on the basis that the prosecution there "chose *one* instance to charge." (Duplicity Reply 4, ECF No. 51.) Presumably, the *Orrock* prosecution elected to rest its charge on the later affirmative act of evasion because the earlier act did not occur within the statute of limitations. *See Orrock*, 23 F.3d at 1208. The panel noted that the crime was "theoretically completed" with the earlier act, *id.*, and throughout its decision wrestled with a question of timeliness as applied to circumstances where multiple affirmative acts of evasion are at issue, *see generally id.* at 1206–09. All of this supports the notion that a single charge of § 7201 may be supported by multiple or alternative affirmative acts of evasion.

2007); *see id.* (condoning the pleading of a single § 7201 count based on a "continuous scheme designed to defeat the payment of multiple tax debts through numerous affirmative acts" (footnotes omitted)). As in *Arreola*, 467 F.3d at 1161, and as with Counts 2 and 4, Count 6 charges Defendant with one crime that the prosecution may prove one of two ways. Defendant fails to meet his burden to show that the count charged is duplicitous because it contains allegations of evasion involving two different tax forms.

### 3. Possible Unanimity Instruction

Although the Court sustains the counts, Defendant's concerns regarding the possibility of a jury unanimity issue are reasonable. (*See* Duplicity Mot. 1 (expressing concern that Counts 2 and 4 as drafted "pose[] a risk of conviction despite a lack of unanimity, where the jury convicts on these counts but does not come to an agreement on what year the violation took place," and that Count 6 "risks a lack of unanimity as the jury could convict on this single count, with a jury unanimous that some crime has been committed but not be unanimous as to which one").) Defendant's fear that a jury verdict may lack unanimity as to the conduct underlying a conviction can be quelled by the administration of an appropriate jury instruction. *See United States v. Gonzalez*, 786 F.3d 714, 717 (9th Cir. 2015) (discussing use of general and specific unanimity instructions). The Court reserves decision on this issue until the pretrial conference.

### C.   Conclusion

Defendant's motion is denied.

## VIII. MOTION TO DISMISS COUNT 9 OF THE INDICTMENT FOR SPECIFIC SELECTIVE PROSECUTION (ECF NO. 31)

Following the motion to dismiss the indictment in its entirety for selective and vindictive prosecution, the instant motion brings special attention to Defendant's

1    arguments for dismissal of Count 9, which charges him with failure to timely pay

2    income tax due for tax year 2019 in violation of 26 U.S.C. § 7203. Defendant asserts

3    that he paid all his past-due taxes in October 2021, and that the Government does not

4    criminally charge taxpayers like him who timely filed their returns, did not timely pay

5    tax obligations, but ultimately paid past-due tax obligations with interest and penalties.

6    (*See generally* Count 9 Selective Prosecution Mot., ECF No. 31.)

7        The Government responds that Count 9 is substantially similar to the other

8    failure-to-pay charges in Counts 1, 2, and 4. It contends that the Court cannot consider

9    Count 9 in a vacuum in the analysis of discriminatory effect. (*See generally* Count 9

10   Selective Prosecution Opp'n, ECF No. 40.)

11

12       **A.   Legal Standards**

13       The Court applies the legal standards for selective and vindictive prosecution set

14   forth *supra* in sections IV(B)(1) and (C)(1).

15

16       **B.   Discussion**

17       Defendant fails to substantiate with evidence a fact fundamental to this motion:

18   that he paid his past-due taxes, including those due for tax year 2019, in October 2021.

19   Calling this fact "uncontested," (Count 9 Selective Prosecution Mot. 4), does not mean

20   the Court has enough information to accept it in connection with a motion to dismiss,

21   *see* Fed. R. Crim. P. 47(b); C.D. Cal. R. 7-5(b); C.D. Cal. Crim. R. 57-1. The motion

22   may be denied on this basis.

23       Even assuming the truth of Defendant's proffer, however, Defendant's motion to

24   dismiss Count 9 fails. Defendant's arguments in this motion pertain to discriminatory

25   effect, but they have little bearing on discriminatory purpose or improper motive. The

26   selective and vindictive prosecution claims accordingly lack merit because Defendant

27   fails to present evidence showing the Government elected to prosecute Count 9 based

28   on Defendant's political and familial affiliations. *See United States v. Kent*, 649 F.3d

906, 912–13 (9th Cir. 2011); *United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007).

The Court declines Defendant's invitation to adjudge his theory of discriminatory effect in relation to Count 9 without looking more broadly to the criminal conduct of which he is accused. Defendant highlights the principle that "[e]ach charge in an indictment must stand *on its own*, and the basis for each charge must withstand scrutiny independent of the other counts." (Count 9 Selective Prosecution Reply 3, ECF No. 52 (citing *United States v. Rodriguez-Gonzales*, 358 F.3d 1156, 1158 (9th Cir. 2004), and *Walker v. United States*, 176 F.2d 796, 798 (9th Cir. 1949)).) That holds true when evaluating whether there are deficiencies in the pleading of the charging document, the context in which the cases he cites for this proposition arose. *See Rodriguez-Gonzales*, 358 F.3d at 1158 ("The information was inadequate *as a matter of pleading* to charge Count Two as a felony." (emphasis added)); *Walker*, 176 F.2d at 798 ("The counts under which appellant was convicted should have charged all of the essential facts or elements necessary to constitute a crime . . . .").

But the selective prosecution inquiry requires Defendant to show that "similarly situated individuals have not been prosecuted." *Sutcliffe*, 505 F.3d at 954. "[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996); *see also United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."); *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000) ("[W]e define a 'similarly situated' person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way

to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant."). A legitimate prosecutorial factor relevant here that goes unaddressed in Defendant's narrow focus in his motion is the "nature and numerosity of the offenses." *Lewis*, 517 U.S. at 28; *cf. United States v. Barry*, No. 18-00111 (RMM), 2019 U.S. Dist. LEXIS 95042, at *11 (D.D.C. June 5, 2019) ("The United States has identified legitimate prosecutorial factors that may justify prosecuting Mr. Barry differently than other allegedly similarly situated individuals. . . . [T]he United States asserted that Mr. Barry has an extensive history of similar conduct, then identified a history of infractions ranging from 2007 to 2018 for similar conduct."). Count 9 cannot be divorced from the other counts in the evaluation of whether other similarly situated individuals were not prosecuted.

The level of generality the Government draws for the inquiry might be too narrow. (*See* Count 9 Selective Prosecution Opp'n 3 ("The defendant has not identified any similarly situated individuals who committed tax crimes for 2016, 2017, and 2018 in substantially the same manner, but who got a pass for their 2019 tax crime based on the IRS's response to the COVID-19 pandemic.").) However, it is enough for the Court to determine that Defendant has not met his burden to show similarly situated individuals have not been prosecuted for untimely payment of income tax. Defendant asserts he is situated similarly to individuals who did not timely pay income tax for tax year 2019 but received leniency due to COVID-19 relief programs. (Count 9 Selective Prosecution Mot. 7–11.) The Government alleges Defendant's nonpayment extended well before the emergence of COVID-19 and leniency programs thereunder, (Indictment ¶¶ 65, 89, 105), providing a legitimate prosecutorial reason to pursue the charge in Count 9 against him and not other individuals who failed to timely pay their 2019 taxes.

### C.   Conclusion

The motion is denied.

78

1   **IX.   MOTION TO DISMISS COUNTS 1–4 FOR IMPROPER VENUE (ECF
2         NO. 32)**

3        Defendant moves to dismiss Counts 1–4 for improper venue, arguing that the

4   charges should not have been brought in this district because Defendant did not become

5   a resident of California until the summer of 2019. (*See generally* Venue Mot., ECF No.

6   32.) The Government opposes, arguing that the Court is bound by the four corners of

7   the indictment, and that the indictment alleges that Defendant became a California

8   resident in April 2018. (*See generally* Venue Opp'n, ECF No. 41.) Defendant replies

9   that the Court should judicially notice the fact that Defendant did not move to California

10  until 2019 or estop the Government from arguing that he moved earlier. (*See generally*

11  Venue Reply, ECF No. 53.) The Court invited, and the Government filed, a surreply

12  addressing the judicial notice and estoppel arguments. (Surreply, ECF No. 62.)

13

14       **A.   Legal Standard**

15       Federal Rule of Criminal Procedure 12(b)(1) permits a pretrial motion to dismiss

16  an offense "that the court can determine without trial on the merits." This includes a

17  motion to dismiss for "improper venue." Fed. R. Crim. P. 12(b)(3)(A)(i). In ruling on a

18  Rule 12(b) motion, the Court is "bound by the four corners of the indictment, must

19  accept the truth of the allegations in the indictment, and cannot consider evidence that

20  does not appear on the face of the indictment." *United States v. Kelly*, 874 F.3d 1037,

21  1047 (9th Cir. 2017). A Rule 12(b) motion "cannot be used as a device for a summary

22  trial of the evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). "The

23  Court should not consider evidence not appearing on the face of the indictment." *Id.*

24

25       **B.   Discussion**

26       Defendant argues that the Court should dismiss Counts 1–4 because Defendant

27  did not live in California at the time of the alleged conduct, and thus venue does not lie

28  in this district. (Venue Mot. 1–2.) In his reply, Defendant provides the Court two

1  pathways to dismissal: judicial notice of a Delaware information filed by Mr. Weiss as

2  United States Attorney for the District of Delaware, which alleges that Defendant lived

3  in Washington, D.C., in 2017 and 2018, and judicial estoppel based on the

4  information.[59] (*See* Venue Reply 4–6; Request for Judicial Notice, ECF No. 53-1; *id.*

5  Ex 1, ECF No. 53-2.) The Court considers each argument in turn.

6

7          1.    Judicial Notice

8          A court may take judicial notice of facts not subject to reasonable dispute because

9  they are either generally known or capable of accurate and ready determination. Fed. R.

10 Evid. 201(b). This may include filings in other courts. *See Reyn's Pasta Bella, LLC v.*

11 *Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of

12 court filings and other matters of public record."). But judicial notice is limited to the

13 existence of a public record and not facts therein that may be subject to reasonable

14 dispute. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (2001); *GemCap Lending,*

15 *LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1019 (C.D. Cal. 2017), *aff'd*, 787

16 F. App'x 369 (9th Cir. 2019). Accordingly, while the Court can take judicial notice of

17 the Delaware Information,[60] the Court cannot take judicial notice of facts contained

18 therein. In any event, the allegations in an information are not facts, they are simply

19 contentions. Furthermore, the contentions in the Delaware Information do not preclude

20 or directly contradict the venue contentions in this action. As the Government notes in

21 the surreply, Defendant could have been a resident of both California and Washington,

22 D.C., at different points in 2018. (Surreply 3.) Thus, the Court denies Defendant's

23 motion to the extent he relies judicial notice of the Delaware Information.

24 _____

25 [59] Defendant raised these two issues in his reply. While a "district court need not

26 consider arguments raised for the first time in a reply brief," *Zamani v. Carnes*, 491

27 F.3d 990, 997 (9th Cir. 2007), the Court addresses them in the interest of judicial
   economy.

28 [60] Defendant's request (ECF No. 53-1) is granted.

1        2.        Judicial Estoppel

2        "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

3  advantage by asserting one position, and then later seeking an advantage by taking a

4  clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778,

5  782 (9th Cir. 2001). The application of judicial estoppel is "appropriate to bar litigants

6  from making incompatible statements in two different cases." *Id.* at 783. The Supreme

7  Court has identified "three factors that courts should consider in determining whether

8  the doctrine is applicable in a given case." *Milton H. Greene Archives, Inc. v. Marilyn*

9  *Monroe LLC*, 692 F.3d 983, 993–94 (9th Cir. 2012).

10             First, a party's later position must be clearly inconsistent with

11             its earlier position. . . . Second, courts regularly inquire

12             whether the party has succeeded in persuading a court to

13             accept that party's earlier position . . . . A third consideration

14             is whether the party seeking to assert an inconsistent position

15             would derive an unfair advantage or impose an unfair

16             detriment on the opposing party if not estopped.

17  *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotation marks

18  omitted). Courts in the Ninth Circuit also consider whether "a party's position is

19  tantamount to a knowing misrepresentation to or even fraud on the court." *Marilyn*

20  *Monroe LLC*, 692 F.3d at 994 (internal quotation marks omitted). And the Ninth Circuit

21  restricts "the application of judicial estoppel to cases where the court relied on, or

22  'accepted,' the party's previous inconsistent position." *Hamilton*, 270 F.3d at 783.

23        Neither party engages with these factors. It is not the role of the Court to make

24  parties' arguments for them. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925,

25  929 (9th Cir. 2003); *see also Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34

26  (9th Cir. 2001) (declining to address an "argument . . . too undeveloped to be capable

27  of assessment"). That said, the Court does not see how it can find that the Delaware

28  court "accepted" the Government's previous allegation that Defendant was a resident

of Washington, D.C., especially where the information was withdrawn and the Delaware court rejected the parties' plea agreement thereon. Nor is the allegation that Defendant resided in California necessarily inconsistent with the allegation that he was a resident of Washington, D.C. Thus, the Court denies Defendant's motion to the extent it relies on the doctrine of judicial estoppel.[61]

### C.   Conclusion

The motion is denied.

## X.   CONCLUSION

For the foregoing reasons, Defendant's motions are denied.

**IT IS SO ORDERED.**

Dated: April 1, 2024

_Mark C. Scarsi_

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

---

[61] As the Court noted at oral argument, and as discussed earlier in this Order, Defendant himself has admitted that he moved to California in the spring of 2018. (Diversion Agreement Attach. A.)